In re FRUEHAUF TRAILER
CORPORATION, et al.,
Debtors.

End of the Road Trust on behalf of
Fruehauf Trailer Corporation, Jacksonville Shipyards, Inc., and Pension
Transfer Corp., Plaintiffs,

v.

Terex Corporation, Randolph W. Lenz
and Marvin B. Rosenberg,
Defendants.

No. Civ.A.–99–477 MMS.

United States District Court,
D. Delaware.

June 2, 2000.

Stephen W. Spence, Kathleen P. Makowski, Phillips, Goldman & Spence, P.A., Wilmington, Delaware; of counsel, Sheldon D. Camhy, David Neier, Douglas A. Amedeo, Maria J. Pantina, Camhy Karlinsky & Stein LLP, New York City, Robin E. Phelan, Michael D. Powell, Michael L. Hood, Haynes and Boone, LLP, Dallas, TX, for Plaintiffs.

Anthony W. Clark, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, of counsel, Jonathan J. Lerner, Maura Barry Grinalds, William J. Hine, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Defendants.

### OPINION

SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff End of the Road Trust, on behalf of Plaintiffs Fruehauf Trailer Corporation and Jacksonville Shipyards, Inc., and Pension Transfer Corp. (collectively "Plaintiffs") filed an Amended Complaint against Defendants Terex Corporation, Randolph W. Lenz, and Marvin B. Rosenberg (collectively "Defendants") alleging breach of fiduciary duty, negligent misrepresentation, gross negligence and mismanagement, unjust enrichment, aiding and abetting breach of fiduciary duty, breach of contract, and breaches of ERISA fiduciary duty mandated by ERISA §§ 502(a)(2) and 502(a)(3). Defendants filed this Motion to Dismiss for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6) and for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2). For the reasons set forth below, Defendants' Motion to Dismiss will be DENIED except as to Count 6 (breach of contract) which will be dismissed to the extent it is premised upon breaches of the duties of due care, good faith, and loyalty.

## II. FACTS

### A. Parties

### 1. Plaintiffs

Plaintiff Fruehauf Trailer Corp. ("Fruehauf") was, prior to bankruptcy, a Delaware corporation, engaged in the business of designing, manufacturing and selling truck trailers and related parts, accessories and services. Fruehauf was also the former sponsor and administrator for the Fruehauf Trailer Corporation Retirement Plan ("Fruehauf Plan"). Amended Complaint ("AC") ¶ 1.

Plaintiff Jacksonville Shipyards, Inc. ("JSI") was a wholly-owned and essentially nonoperating subsidiary of Fruehauf which had previously manufactured ships and sandblasting equipment. JSI was the former sponsor and administrator of the Pension Plan for Hourly Rated (Union) Employees of Jacksonville Shipyards, Inc. ("JSI Plan"). AC ¶ 1.

On October 7, 1996, Fruehauf, JSI and other affiliated entities of Fruehauf filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. Their consolidated Plan of Reorganization (the "Plan") became effective October 27, 1998. AC ¶ 1.

Plaintiff Pension Transfer Corp. ("Pension Transfer") is a Delaware Corporation formed on September 21, 1998 with its principal place of business in California. Pension Transfer is the subsequent plan sponsor and plan administrator of the Fruehauf Plan and the JSI Plan. Pension Transfer's purpose is sponsorship, management and administration of these two plans, which were merged in 1998 to form one plan (hereinafter collectively referred to as the "Fruehauf Plan"). AC ¶ 2.

Plaintiff End of the Road Trust ("ERT") is a liquidating creditor trust formed pursuant to the Plan for Reorganization and operating under the laws of the State of Delaware with its principal place of business in California. Pursuant to the Plan, this action, as well as Fruehauf's and JSI's other assets and claims, were transferred to ERT. This action is being prosecuted under the authority of the Plan by ERT for the purpose of maximizing Fruehauf's and JSI's assets and claims. AC ¶ 1.

### 2. Defendants

Defendant Terex Corporation ("Terex") is a Delaware corporation with its principal place of business in Connecticut. Terex designs and manufactures heavy duty, off-highway, earth moving, lifting, and material handling equipment, attachments and parts for the construction and mining industries. From 1989 through August 1993, Terex was the parent company of Fruehauf and its dominant shareholder. AC ¶ 3.

Defendant Randolph W. Lenz ("Lenz") is a citizen and resident of Florida. From 1989 through August 1993, Lenz was Chairman of the Board of Fruehauf, Chairman of the Board of Terex, and Chairman of the Board, President and majority stockholder of KCS Industries, Inc. ("KCS"), a company which purported to provide legal, financial, and management services to Fruehauf and for which KCS received a monthly fee. AC ¶ 4.

Defendant Marvin B. Rosenberg ("Rosenberg") is a citizen and resident of Connecticut. From June 1989 through August 1993, Rosenberg was the Secretary and a Director of Fruehauf, and was the Secretary, General Counsel, and a Director of Terex; and was the General Counsel of KCS. Rosenberg continued to serve as Director of Fruehauf until September 1996 and remains a Director of Terex to this day. AC ¶ 5.

### B. Background of Terex Acquisition of Fruehauf

Between 1914 and 1989, Fruehauf (referred to herein as "Old Fruehauf") operated trailer manufacturing, distributing, sales and servicing facilities throughout the United States and was a leader in domestic used trailer sales. The company manufactured and marketed a wide variety of trailers and related products, including dry freight vans, refrigerated vans, platform trailers, liquid and bolt type trailers and dump trucks. Old Fruehauf also operated sales and services organizations that purchased and sold used trailers, sold replacement parts and offered maintenance services.

On July 14, 1989, Terex purchased Old Fruehauf's trailer division and maritime subsidiaries and the "Fruehauf" trade name through a complex and highly leveraged transaction (the "1989 Acquisition"). The trailer division and maritime subsidiaries became known as Fruehauf and was a wholly owned subsidiary of Terex. Terex paid an aggregate purchase price of approximately $231 million, obtaining much of the funds from $160 million in notes placed with certain institutional lenders. AC ¶¶ 15–16. Plaintiffs allege Defendants spent little or no time conducting due diligence in connection with the 1989 Acquisition. AC ¶ 19.

### C. Allegations of Defendants' Mismanagement of Fruehauf: July 1989 – August 1993

The Amended Complaint contains the following allegations of mismanagement of

Fruehauf by Defendants between the July 1989 Acquisition and August 1993.

### 1. Assumption Agreement

As part of the 1989 Acquisition, Old Fruehauf and Fruehauf entered into an Assumption Agreement, whereby Fruehauf assumed substantially all liabilities related to Old Fruehauf's trailer businesses, as well as the liabilities of its maritime subsidiaries, whether they were in the form of current or future claims (collectively referred to as "trailing liabilities"). The trailing liabilities included all current and future claims that might be brought under workers' compensation insurance coverage, assumed benefit plans, such as medical and retiree benefits, environmental liabilities, certain guarantee obligations, and products liabilities obligations. Plaintiffs allege Defendants reasonably should have known of the seriousness and extent of the trailing liabilities, but disregarded the consequences of the trailing liabilities vis a vis the business. AC ¶ 17.

### 2. KCS Management Agreement

As part of the 1989 Acquisition, Old Fruehauf and Fruehauf also entered into a management agreement with KCS whereby KCS purported to provide legal, financial and management services to Fruehauf in exchange for approximately $300,000 per month. Plaintiffs contend KCS, which was owned and operated by Lenz, did not provide services to Fruehauf of a value commensurate with the fee charged or that Fruehauf was not already obtaining from other professionals. AC ¶ 18.

### 3. Falsely Publicizing Strong Turn Around

Following the 1989 Acquisition, Fruehauf began publicizing efforts to restructure its operations and pare down its debt. Defendants claimed to have caused a strong turn around with positive results, purportedly for Fruehauf. In reality, Fruehauf was suffering significant losses.

The economic recession of the early 1990's deeply affected trailer sales, and the entire trailer industry, including Fruehauf, suffered as a result. AC ¶ 20.

### 4. Business Restructuring Decisions

First, Defendants caused Fruehauf to cancel its products liability insurance and attempt self insurance, a decision which conserved immediate short term cash, but severely and negatively impacted the company's operations in the long term. AC ¶ 21.

Second, Defendants caused Fruehauf to sell off its distributors' network to garner immediate cash, leaving the company with only its manufacturing division. Fruehauf's distributors' network had been a unique and profitable part of its operations. The sole remaining business of trailer manufacturing was subject to increasingly difficult competition and was itself increasingly less profitable. AC ¶ 21.

Third, Defendants caused Fruehauf to lower its inventory to levels so low that customers could no longer rely on Fruehauf's ability to provide and service trailers. With its funds diverted, Fruehauf was unable to pay its vendors consistently. Vendors stopped supplying parts, resulting in half-built trailers stagnating at the factories. AC ¶ 22.

Fourth, despite reduced cash flow, Defendants caused Fruehauf to use available cash to continue paying the monthly KCS "management" fee and the salaries of other Terex "advisors." AC ¶ 22. Fifth, Defendants caused Fruehauf to sell real estate for an amount considered to be substantially less than fair market value. AC ¶ 23. Sixth, Defendants directed that all mechanics at Fruehauf branches be fired, notwithstanding that this service work was providing one of the better sources of revenue for Fruehauf and could absorb most of the overhead of the company's branch offices. AC ¶ 23.

Finally, Defendants failed to seek Chapter 11 relief for the company, even though

such relief would have benefitted the company. A Chapter 11 filing would have brought Fruehauf statutory protections, such as periods of protection in which to operate the company, the opportunity to abrogate obligations and to reject contracts like the trailing liabilities contract and the KCS management contract, and the opportunity to work out a debt restructure with senior lenders. AC ¶ 26.

### 5. Violations of Loan Covenants

Defendants' management decisions affecting Fruehauf had caused Fruehauf to violate material covenants in its loan agreements with institutional lenders, including minimum income and net worth requirements. Such continuing violations would have constituted default enabling Fruehauf's lenders to demand immediate payment of all outstanding debt. AC ¶ 24. In order to avoid default, Defendants succeeded in covertly agreeing to alter the covenants by reducing the required minimum levels of profitability. Pursuant to this agreement, the minimum operating income required was reduced from $8 million to $2 million for the first six months of 1991, an amount that Defendants falsely depicted was a profit level that Fruehauf had achieved. However, Defendants had improperly overstated Fruehauf's net income to make it appear the company had achieved even this diminished level of profit. Rather than having been profitable in 1990, Fruehauf actually suffered significant losses for the year, thereby greatly exacerbating and magnifying the magnitude and materiality of Fruehauf's loan covenant violations. The company's true operating income was insufficient to meet the financial covenants in the loan agreements and, without further infusions of cash, the company would be unable to satisfy its loan covenants in the future. AC ¶ 25.

### 6. Initial Public Offering ("IPO")

In July 1991, Defendants announced an initial public offering ("IPO") of Fruehauf stock. AC ¶ 30. Defendants had continued to mislead the public that Fruehauf's debt was under control; that Fruehauf's restructuring was proceeding according to plan; that a "turn around" had occurred; and that the company's future prospects under Defendants' leadership and control were positive. AC ¶ 31. The IPO prospectus falsely portrayed an optimistic future for Fruehauf even though Defendants knew Fruehauf had liquidity problems and that Fruehauf's purported "turn around" was the false product of accounting improprieties. AC ¶ 32. Defendants kept secret their motivations for the IPO, which were: (i) to cure temporarily the problem of Fruehauf's noncompliance with its debt covenants; (ii) to obtain waivers and/or decreased levels of certain negative financial covenants to avoid imminent default; and, (iii) to recoup their initial investment in Fruehauf. AC ¶ 33. Although Fruehauf sold four million shares, $2.7 million of the proceeds was paid to Terex and $5.5 million was paid to KCS. AC ¶ 34. Defendants used the remaining proceeds of the IPO to, in part, to pay down Defendants' 1989 Acquisition debt. AC ¶ 35.

### 7. Corporate Loan Transactions

In March 1992, without the knowledge of Fruehauf's financial staff, Board of Directors, or Audit Committee, Lenz liquidated $1 million worth of Fruehauf's marketable securities. In November 1992, again acting in secret and without the knowledge of Fruehauf's financial staff, Board of Directors, or Audit Committee, Lenz liquidated and utilized an additional $622,000 worth of Fruehauf's marketable securities. These funds were combined with the $1 million he had earlier appropriated and were used to post an appeal bond for the personal benefit of Lenz in litigation a brokerage firm had brought against him involving his own brokerage account. AC ¶ 36.

Although the Fruehauf Board of Directors later purported to "ratify" Lenz's actions, the Board insisted that Lenz re-

turn the value of the securities he had appropriated. Lenz caused Terex to pay $1.6 million to Fruehauf, with the sum purportedly reimbursed by one of Lenz's companies. The funds were repaid to Fruehauf with interest at rates ranging from 6% to 8%. However, in March 1992 and November 1992, at the time of liquidation, the $1 million and the $622,000 bonds were enjoying annual yields in excess of 13% and 10%, respectively. AC ¶ 37.

### 8. Accounting and Auditing Violations

First, Lenz refused for a substantial period to permit the members of the Audit Committee of Fruehauf's Board to meet and direct the audit responsibilities for Fruehauf. Following protests by the company's outside auditors, Lenz dismissed those auditors in October 1992. AC ¶ 23.

Also, Defendants directed a series of false accounting methods to produce inaccurate financial statements and material violations of generally accepted accounting principles ("GAAP"). As a consequence, substantial profits were claimed after the 1989 Acquisition, when in fact, Fruehauf had suffered substantial losses. For the fiscal years ended December 31, 1989 through 1992, Defendants caused Fruehauf to engage in accounting improprieties described in the Amended Complaint as follows:

i. Defendants caused Fruehauf improperly to apply purchase accounting rules to overstate its pretax earnings by approximately $77.3 million from the time of the 1989 Acquisition through its fiscal year ended December 31, 1992; [described in more detail in AC ¶ 47]

ii. Defendants misstated Fruehauf's financial condition by improperly excluding losses of certain subsidiaries held for sale from its consolidated earnings; [described in more detail in AC ¶ 47]

iii. Defendants caused Fruehauf to manipulate its operating results through selective adjustment of overstated purchase accounting reserves; [described in more detail in AC ¶ 47]

iv. Defendants mischaracterized positive trends as a result of successful restructuring efforts, when in fact the trends were nothing more than accounting manipulations; and

v. Defendants failed to disclose or inadequately disclosed the impact of an adjustment of a pension liability and the short term nature of a bank debt. [described in more detail in AC ¶¶ 49–50]

In addition, AC ¶ 48 alleges Defendants caused Fruehauf to establish improper purchase accounting reserves:

In accounting for the 1989 Acquisition, Defendants caused Fruehauf to establish large reserves (liabilities) for future costs of disposition and then to understate expenses of subsequent periods by improperly charging expenses against these reserves, instead of reflecting the costs as operating expenses in Fruehauf's income statement. Recording future costs as liabilities assumed in the 1989 Acquisition artificially enhanced reported earnings subsequent to the 1989 Acquisition because certain subsequent expenditures are recorded as reductions in these liabilities instead of being recognized as current period expenses. This exclusion of expenses from the results of operations falsely increases reported earnings for subsequent periods in 1990 and 1991.

Finally, AC ¶ 51 alleges Defendants manipulated Fruehauf's accounting in connection with the violation of debt covenants:

By November 1991, at the time Fruehauf filed its Form 10–Q for the third quarter, the company had approximately $99.7 million in bank debt. Defendants caused Fruehauf to improperly classify $82.7 million of this amount as "long term" in its Balance Sheet for the third

quarter of 1991. Defendants had known by the third quarter of 1991 that Fruehauf had not met certain of the financial ratios required to maintain its bank debt. Defendants were aware that Fruehauf's failure to comply with its loan covenants was not a condition that had been waived or cured. Whereas Fruehauf was required to reclassify the outstanding $82.7 million in loans as a current liability at the end of the third quarter of 1991, Defendants nevertheless caused Fruehauf to improperly classify Fruehauf's $82.7 million in debt as a long term obligation in the company's third quarter report for 1991 that was publicly disclosed.

### 9. Insider Trading

Defendants profited from manipulation of stock gains as a result of insider information and further manipulation of pension plan assets. AC ¶ 52. Between 1991 and 1993, and with knowledge of the improper accounting and false disclosures, Lenz exercised warrants and sold substantial blocks of stock of Fruehauf and Terex. During 1993 and with knowledge of the improper accounting and disclosure, Lenz, Terex and Rosenberg sold substantial amounts of shares of common stock of Fruehauf. AC ¶ 53. As a result of the deceptions the market prices of Fruehauf and Terex stock were artificially inflated in substantial amounts during these periods. AC ¶ 55. When the marketplace finally learned of these accounting deceptions, the value of the stocks decreased dramatically. AC ¶ 54.

### 10. Transactions Involving Pension Plans

Before 1989, Fruehauf sponsored the previously described Fruehauf Plan. AC ¶ 56. After Terex acquired Fruehauf, Defendants established one trust to hold the assets of the Fruehauf Plan, and appointed Continental Bank, N.A. ("Continental") as trustee. AC ¶ 57. At the same time, Terex sponsored its own retirement plan (the "Terex Plan"), the assets of which were held in a second, separate trust. AC ¶ 57.

On January 1, 1992, the two trusts merged to hold the assets of the Fruehauf Plan and the Terex Plan in a single, commingled master trust (the "Master Trust"), with Continental as trustee. On September 8, 1992, Terex appointed Lenz as the sole member of the investment committee for the Master Trust, which gave Lenz discretionary responsibility to manage, acquire, dispose of, and invest the assets of the Master Trust. In September 1994, Fruehauf caused the Master Trust to be separated into separate trusts, one for the Fruehauf Plan (the "Fruehauf Trust") and one for the Terex Plan (the "Terex Trust"). Lenz, as sole member of the Investment Committee, allocated the Master Trust assets between the Fruehauf Trust and the Terex Trust. AC ¶ 58.

On March 31, 1993, Lenz directed Continental to invest $1 million of Master Trust assets in an investment trust called the Asset Acquisition Trust Limited Partnership ("AAT"). One of the assets held by the AAT was Connecticut Bank of Commerce, a bank in which Lenz held an ownership interest, and in which both Lenz and Rosenberg served as members of the Board of Directors. Continental completed the investment of the $1 million in the Asset Acquisition Trust in reliance upon representations given by Lenz, and in reliance upon a purported March 31, 1993 "opinion of counsel" given by Rosenberg, that the transaction would not violate ERISA. AC ¶ 59. On or around June 2, 1993, Continental discovered that Lenz and Rosenberg failed to disclose material information regarding their personal interests in the Connecticut Bank of Commerce and notified Lenz that the $1 million investment was fiduciary self-dealing, a conflict of interest, and a prohibited transaction, resulting a violation of ERISA. AC ¶ 60. When Continental attempted to remedy the violations by undoing the transaction, Lenz fired Continental as trustee. AC ¶ 61.

In 1993, Lenz caused the Master Trust to invest in Terex stock appreciation rights ("SARs"). Although Lenz obtained an independent appraiser to value the SARs, Lenz withheld essential facts, resulting in under-valuation of the SARs. In 1994, Lenz allocated Terex stock and SARs entirely to the Terex Trust, with none allocated to the Fruehauf Trust. AC ¶ 62. Shortly after the allocation, the SARs were substantially greater in value than the value assessed in connection with the allocation. The Terex Trust, not the Fruehauf Trust, obtained all of the benefit of the true increase in value of the SARs. AC ¶ 63.

Between 1990 and 1993, Lenz directed the Fruehauf Plan to loan money to or for the benefit of Fruehauf and Terex, in the initial amount of approximately $3.3 million. In 1993, a letter of credit was substituted for the loan notes. The amounts outstanding under the letter of credit were exchanged in May 1995 for Fruehauf senior secured notes. The loans from the Fruehauf Plan benefitted Lenz and Rosenberg, who both had ownership interests and senior management positions in both Fruehauf and Terex. AC ¶ 64.

In 1991, Lenz caused the Fruehauf Plan to enter into an agreement with Richard Adams whereby Adams was empowered to "manage" $750,000 of the Fruehauf Plan's assets. When Continental learned of the arrangement, it notified Defendants that the agreement violated trust documents. Disregarding Continental's warnings, Lenz entrusted Adams with $750,000 from the Fruehauf Plan for investment in high-risk derivatives. The entire $750,000 thereafter was lost, and the Fruehauf Plan was able to recover only a small portion in Adams' subsequent Chapter 7 bankruptcy case. AC ¶ 65.

## D. Defendants Concealment of Mismanagement

The Amended Complaint alleges Defendants concealed all of the above mentioned mismanagement activities until at least March 1994. AC ¶¶ 38–45, 66–69. Defendants contend that all of these transactions were fully disclosed in publicly filed documents prior to August 1993. The issue of concealment and disclosure is discussed more fully in section V.B.1.b, *infra.*

## E. August 1993 Recapitalization and Change in Control

In 1992, Fruehauf hired a new president, Thomas Roller. AC ¶ 38. In August 1993, Roller caused Fruehauf to restructure its financing, resulting in several changes to the management and ownership of Fruehauf. First, Lenz resigned from his position on the Fruehauf Board of Directors. AC ¶ 39. In addition, Rosenberg resigned his position as Secretary of Fruehauf, although he stayed on the Board as an outside director. Also, Terex decreased its ownership of Fruehauf common stock from 42% to 26%. Terex also relinquished its voting rights in this stock. Lenz's and Rosenberg's ownership interests in Fruehauf were reduced to 5.4% and 1%, respectively. Finally, the management agreement with KCS was terminated.

## F. March 1995 Restatement of Financials

In March 1994, Fruehauf learned that its outside auditor, Deloitte & Touche, was "refusing to reissue audit reports" for 1989–1992 and that the prior reports could no longer be relied upon. AC ¶ 40. Fruehauf confirmed that the financial statements for 1989–1992 could no longer be relied upon as accurate. AC ¶ 41. Fruehauf publicly announced this news about the financial statements, causing its business to deteriorate rapidly due to a perception it had "cooked books." AC ¶¶ 42, 44. After much investigation and work, Fruehauf re-issued its 1989–1992 financial statements in March 1995, which showed significant losses in each of these years. AC ¶ 43.

## G. *Rebenstock* Class Action and Release

In January 1995, a class of Fruehauf stockholders filed a Second Amended Complaint against, inter alia, Fruehauf, Terex, Lenz, and Rosenberg, in a case captioned Rebenstock v. Fruehauf Trailer Corp., Case No. 92–CV–72050–DR (E.D.Mich.). This action alleged securities law violations and made some of the same allegations as the Amended Complaint in this case. On June 15, 1995, the case was settled. The Stipulation of Settlement included a Release entered into by Fruehauf, Terex, Lenz, and Rosenberg, in which each of them "releases and forever discharges each other ... from any and all claims, rights of action and causes of action arising out of the Litigation only."

## H. Fruehauf's 1996 Malpractice Action Against Deloitte & Touche

In March 1996, Fruehauf filed an action in Delaware Superior Court against its outside auditor Deloitte & Touche ("D & T"), alleging the same accounting improprieties as alleged in the Amended Complaint in this case. *See Fruehauf Trailer Corp. v. Deloitte & Touche, L.L.P.*, C.A. No. 966–03–32(JEB) (Del.Super.Ct.). That case was settled on April 25, 1996.

## III. SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the causes of action arising under the laws of the United States. In addition, the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) over the causes of action arising under and related to cases under the Bankruptcy Code. Also, the Court has jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) over the causes of action under the provisions of ERISA. Finally, the Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims arising from the same set of operative facts that give rise to the claims based on the Bankruptcy Code and ERISA.

## IV. STANDARD OF APPLIED TO A MOTION TO DISMISS

A motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), should be granted only if, accepting all allegations in the Amended Complaint as true and viewing them in the light most favorable to the Plaintiffs, the Plaintiffs are not entitled to relief as a matter of law. *See In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1420 (3d Cir.1997).

## V. DISCUSSION

### A. What Evidence to Consider in Rule 12(b)(6) and Rule 12(b)(2) Motion to Dismiss

Both parties submitted voluminous appendices of documents for the Court to consider in deciding this Motion to Dismiss for failure to state a claim, pursuant to Rule 12(b)(6), and for lack of personal jurisdiction, pursuant to Rule 12(b)(2). In a motion to dismiss for failure to state a claim, submitted pursuant to Rule 12(b)(6), the Court may consider (1) documents attached to or incorporated by reference into the complaint, (2) matters of public record; (3) undisputably authentic documents upon which the claims are based. *PBGC v. White*, 998 F.2d 1192 1196 (3d Cir.1993). Matters of public record include documents that are required by law to be filed with the SEC. *See Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir.1991). In a motion to dismiss for lack of personal jurisdiction, submitted pursuant to Rule 12(b)(2), the Court may also consider "sworn affidavits or other competent evidence" related to personal jurisdiction. *See Patterson v. Federal Bureau of Investigation*, 893 F.2d 595 (3d Cir.1990).

The parties have stipulated as to the exhibits which the Court may consider. Accordingly, the Court will consider Defendant's Exhibits ("D# ") D1–D8, D15–D29, D31–D53, Plaintiff's Exhibits ("P# ") P1–P2, P28–P40, and Defendant's Supplemental Exhibits ("DS# ") DS1–3. The

Court will not consider D9–D13, D30, P3–P27, and P41–43.

## B. State Law Claims

### 1. Statute of Limitations

▓▓▓▓ Defendants argue that all of Plaintiffs state law claims in Counts 1 through 6 are barred by the Delaware statute of limitations which provides:

> no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of such action.

10 Del.Code § 8106. This three year statute of limitations applies to the claims for breach of fiduciary duties (Count 1);[1] negligent misrepresentation (Count 2);[2] gross and negligent mismanagement (Count 3);[3] unjust enrichment (Count 4);[4] aiding and abetting breach of a fiduciary duty (Count 5);[5] and, breach of contract (Count 6).[6] Under § 8106, "the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the alleged wrong-

ful act, even if the plaintiff is ignorant of the cause of action." *In re Dean Witter Partnership Litig.*, 1998 WL 442456, *4 (Del.Ch.1998), *aff'd mem.*, 725 A.2d 441 (Del.1999). Absent some reason to toll the statute or some other statutory provision extending the statute, the plaintiff must file suit within three years of the alleged wrongful act. *See id.*

It is undisputed that ERT filed the present action on October 6, 1998. The parties also agree that, accepting all allegations in the Amended Complaint as true, the latest date that an alleged wrongful act may have occurred was August 1993.[7] Transcript of Oral Argument ("Tr.") 14:4–8; Tr. 14:11–15:6. Therefore, the statute of limitations expired, at the latest on August 31, 1996. At first blush, the claims appear to be time barred, as they were filed well more than three years after the latest possible date that the action accrued.

However, Plaintiffs argue that the claims are not time barred because: (1) the claims have an effective filing date of October 7, 1996 because of the petition for

---

1. *See Fike v. Ruger*, 754 A.2d 254, 259–60 (Del.Ch.1999) (citing *United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del.1996)). Plaintiffs argue that the court should not rigidly apply the statute of limitations to claims for breach of fiduciary duty because they are equitable claims. However, where, as here, the relief sought on an equitable claim is money damages, Delaware courts apply the § 8106 three year statute of limitations. *See id.*

2. *See Advocat v. Nexus Industries, Inc.*, 497 F.Supp. 328, 334 (D.Del.1980).

3. *See Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Service, Inc.*, 1996 WL 506906, *15–*16 (Del.Ch.1996).

4. *See Nepa v. Marta*, 348 A.2d 182, 183 (Del. 1975).

5. *See Fike,* 754 A.2d at 259–60.

6. *See Fike,* 754 A.2d at 259–60. Defendants argue that the breach of contract claim against Lenz and Rosenberg (Count 6) is governed by the 1 year statute of limitations in 10 Del.Code § 8111, which provides:

No action for recovery upon a claim for wages, salary, or overtime for work, labor, or personal services performed ... shall be brought after the expiration of one year from the accruing of the cause of action. 10 Del.Code § 8111. However, § 8111 only applies to "a breach of a duty to pay wages, salary, or overtime for work performed." *Rich v. Zeneca Inc.*, 845 F.Supp. 162, 166 (D.Del.1994). Employer-employee claims arising out of breach of any other duty is governed by the 3 year limitations period in § 8106. In this case, Count 6 alleges that Lenz and Rosenberg breached their duty to Fruehauf to provide "their expertise and undivided and loyal service." Complaint ¶ 93. Because this is not a breach of the duty to pay compensation, the claim is governed by the 3 year statute of limitations in § 8106.

7. The Amended Complaint actually alleges that Defendants improperly sold Fruehauf stock based on inside information from 1990 through 1993, without specifying a month in 1993. AC ¶¶ 55–57. The Court accepts the representations of both parties that the Amended Complaint does not allege any wrongful act occurring after August 1993. Tr. 13:24–15:6.

Bankruptcy; (2) the statute of limitations is tolled by Defendants' fraudulent concealment; (3) the statute of limitations for the breach of fiduciary duty claim is tolled under the doctrine of equitable tolling; (4) the statute of limitations is tolled due to Defendants' domination and control of Fruehauf after August 1993; and, (5) equitable estoppel prevents the Defendants from asserting a statute of limitations defense. The Court holds that the claims have an effective filing date of October 7, 1996, and because of fraudulent concealment, equitable tolling, and equitable estoppel the statute must be tolled until March 1994.[8] Therefore, any claim filed within three years of March 1994, i.e., by March 1997, is timely filed for statute of limitations purposes. It follows, these claims were timely filed on October 7, 1996, less than three years after March 1994.

### a. Effective Filing Date of Claims

 The parties agree, absent any other statutory provision in addition to the statute of limitations, Plaintiffs claims would be barred by the statute of limitations, as they were filed on October 6, 1998, more than three years after Plaintiffs concede they acquired knowledge of the allegations. However, if the statute of limitations has not run on a claim as of the bankruptcy petition date, 11 U.S.C.

**8.** The Court declines to address the Plaintiffs' theories of tolling due to equitable estoppel and domination and control of the board of Fruehauf because they are unnecessary to resolution of the statute of limitations issue.

**9.** Defendants' argument that the late service of the Amended Complaint makes it untimely is without merit. Defendants rely on Bankruptcy Rule 7004(e), which provides that the summons and complaint must be served "within 10 days following issuance of the summons." Fed.R.Bankr.P. 7004(e). In this case, the summons on the Amended Complaint originally issued on October 27, 1998, but was never served. *See* Bankr.Docket Item ("B.D.I.") 2.

However, Rule 7004(e) further provides that "[i]f the summons is not timely delivered

§ 108(a) extends the time period for filing the claim by two years:

> If applicable nonbankruptcy law ... fixes a period in which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>
> (1) the end of such period ... or
>
> (2) *two years after the order for relief.*

11 U.S.C. § 108(a) (emphasis added). In a voluntary petition, as in this case, the filing of the petition operates as an order for relief. *See id.* at § 301. Under 11 U.S.C. § 108(a), the effective filing date, for statute of limitations purposes, is October 7, 1996, the date of Plaintiffs' petition for Chapter 11 bankruptcy protection.

 If the statute of limitations had not expired before filing the petition on October 7, 1996, Plaintiffs commencement of the action less than two years later on October 6, 1998 is deemed timely. *See, e.g., In re Walnut Leasing Co., Inc.,* 1999 WL 729267, *6 (E.D.Pa.1999) (claims timely under § 108(a) when filed within two years of voluntary petition). In sum, if the statute of limitations is tolled until at least October 7, 1993, the Amended Complaint was timely filed on October 6, 1998.[9] The critical question then becomes whether the statute of limitations was tolled between August 1993 (the date of the last alleged

or mailed, another summons *shall* be issued and served." *Id.* (emphasis added). If a complaint is not served within 10 days, but the court grants additional time for service, then the complaint is deemed to have been timely served and receives the benefit of its original filing date. *See In re Krikava,* 236 B.R. 701, 705–06 (D.Neb.1999); *Sparagna v. Metzger,* 1998 WL 127595, *2 (Bankr.E.D.Va. 1998); *In re Barr,* 217 B.R. 626, 631 (Bankr. W.D.Wash.1998). The summons was reissued by the Bankruptcy Court on January 22, 1999 and served within several days. *See* B.D.I. 4–6. Since the Bankruptcy Court effectively granted permission to extend the time for service, the Amended Complaint was timely served.

act) and October 7, 1993 (three years prior to the effective filing date of this action). The Court now turns to the three tolling theories advanced by the Plaintiffs.

### b. Tolling Due to Fraudulent Concealment

The statute of limitations will be tolled under the doctrine of fraudulent concealment if the plaintiff can prove: "an affirmative act of concealment by the defendant—an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put the plaintiff off the trail of inquiry." *Dean Witter,* 1998 WL 442456 at *5. If there has been fraudulent concealment, then the statute of limitations is tolled until the plaintiff knew or should have known of the alleged wrong. *See id.* However, the statute will not be tolled beyond the time when plaintiffs acquired inquiry notice of the alleged wrong. *See id.* at *6. The plaintiff bears the burden of pleading facts to prove that the statute should be tolled. *See In re ML/EQ Real Estate Partnership Litig.,* 1999 WL 1271885, *1 (Del.Ch.1999). Thus, the statute will be tolled if: (a) the Amended Complaint alleges that Defendants fraudulently concealed the alleged wrongs from Plaintiffs; and (b) Plaintiffs lacked inquiry notice of the alleged wrongs.

### (1) Fraudulent Concealment

Fraudulent concealment can encompass either "[1] the commission of affirmative acts of misrepresentation or [2] failure to disclose facts when there is duty to disclose." *Litman v. Prudential–Bache Properties, Inc.,* 1994 WL 30529, *4 (Del. Ch.1994). To establish fraudulent conceal-

ment under the first prong, the Amended Complaint, and supporting documents, must allege Defendants had actual knowledge of the wrong and acted affirmatively to conceal the wrong from Plaintiffs. *See Dunleavy v. Dugan,* 1990 WL 49421, *4 (D.Del.1990) (citing *Bradford, Inc. v. Travelers Indemnity Co.,* 301 A.2d 519, 525 (Del.Super.1972)). Under the second prong, fraudulent concealment may be established absent any affirmative act, by alleging a business fiduciary relationship between Defendants and Plaintiffs and a duty to disclose. *See id.* (citing *Bradford,* 301 A.2d at 525; 51 Am.Jur.2d Limitation of Actions § 149 (1970)). The Amended Complaint contains sufficient allegations, for the pertinent time period, that Terex, Lenz, and Rosenberg had fiduciary duties to Fruehauf by virtue of their positions as dominant shareholders,[10] directors,[11] and officers.[12] *See, e.g.,* AC ¶ 3 ("Terex was, at times relevant to this action, the parent company of Fruehauf or its dominant shareholder."); AC ¶ 4 ("At times material to this action, Lenz was Chairman of the Board of Fruehauf, Chairman of the Board of Terex. . . ."); AC ¶ 5 ("At times material to this action, Rosenberg was the Secretary, and a Director of Fruehauf. . . ."). As a consequence, at this procedural stage, the Amended Complaint alleges fiduciary relationships sufficient to establish either of the two types of fraudulent concealment.

The Amended Complaint also alleges affirmative acts of misrepresentation and/or failures to disclose material facts by Terex, Rosenberg, and Lenz from the time Terex acquired Fruehauf in July 1989 until at least March 1994.[13] By way of example,

---

**10.** *See Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110, 1113–16 (Del. 1994).

**11.** *See Arnold v. Society for Sav. Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996).

**12.** *See id.*

**13.** The Amended Complaint also contains allegations of fraudulent non-disclosures by De-

loitte & Touche, L.L.P. ("D & T"). D.I. 27 at 10–11. Defendants assert that these acts are insufficient to toll the statute of limitations because they were performed by a non-party to the litigation. *Id.* Having found sufficient fraudulent concealment by the Defendants, the Court need not reach the question of whether acts by third parties are sufficient to toll the statute of limitations.

the following is a non-exhaustive list of the alleged acts that were allegedly fraudulently concealed (with emphasis added):

20. Following the 1989 Acquisition and under Lenz's control, Fruehauf began publicizing what [sic] portrayed as efforts to restructure its operations and pare down its debt. Defendants claimed to have caused a strong turn around with positive results, purportedly for Fruehauf. *In reality, Fruehauf was suffering significant losses.* The economic recession of the early 1990's deeply affected trailer sales, and the entire trailer industry, including Fruehauf, suffered as a result. Instead of applying cash to revive the business of Fruehauf, Defendants instead diverted sums for their own benefit. [AC ¶ 20 (Dec.1992)]

. . . .

25. In order to avoid exposure of the defaults, Defendants, *without public disclosure, covertly agreed* to alter the covenants requiring certain minimum levels of profitability. Pursuant to this agreement, the minimum operating income performance required of Fruehauf was reduced from $8 million to $2 million for the first six months of 1991, an amount that Defendants falsely depicted was a profit level that Fruehauf had achieved. However, Defendants had improperly overstated Fruehauf's net income to appear that the company had achieved even this diminished level of profit. Rather than having been profitable in 1990, Fruehauf actually suffered significant losses for the year, thereby greatly exacerbating and magnifying the magnitude and materiality of Fruehauf's loan covenant violations. The company's true operating income was insufficient to meet the financial covenants in the loan agreements and, without further infusions of cash, the company would be unable to satisfy its loan covenants in the future. *No public disclosure was made of these circumstances affecting Fruehauf during 1990 and 1991.* [AC ¶ 25 (mid–1991)]

. . . .

28. As specifically discussed below, Defendants manipulated Fruehauf's accounting *to conceal the company's rapidly deteriorating financial condition* and dismal outlook in 1991. *These manipulations, and their effect on the company, came to light years later.* If Fruehauf had received the benefit of legitimate accounting, the company could have taken steps to reorganize or recapitalize with a resulting net benefit to the company, its shareholders and creditors well in excess of the recoveries available by the time Fruehauf came to liquidate through bankruptcy in 1996. Had a Chapter 11 bankruptcy been filed, Fruehauf could have been in a position to benefit from the economic recovery in the trailer industry. Instead, Defendants' actions in mid–1991 succeeded in deepening the company's actual insolvency, in violation of their fiduciary duties. [AC ¶ 28 (Dec.1992)]

. . . .

30. *Notwithstanding their knowing that Fruehauf was in default* of its loans and could no longer raise additional cash, Defendants announced the "turnaround" at Fruehauf and sought capital from the public markets through an initial public offering ("IPO") of Fruehauf stock. [AC ¶ 30 (Dec.1991)]

. . . .

32. The IPO's prospectus, dated July 8, 1991, optimistically portrayed Fruehauf's future. These statements were false because *Defendants knew Fruehauf had liquidity problems* and that Fruehauf's purported "turn around" of profitability that they had trumpeted the false product of the accounting improprieties. [AC ¶ 32 (Dec.1991)]

. . . .

36. Defendants continued their use of Fruehauf against the company's best interests. For example, in March 1992, *without the knowledge of Fruehauf's financial staff, Board of Directors, or Audit Committee,* Lenz liquidated $1

million worth of Fruehauf's marketable securities. In November 1992, again *acting in secret and without the knowledge of Fruehauf's financial staff, Board of Directors, or Audit Committee,* Lenz liquidated and utilized an additional $622,000 worth of Fruehauf's marketable securities. These funds were combined with the $1 million he had earlier appropriated and were used to post an appeal bond for the personal benefit of Lenz in litigation a brokerage firm had brought against him involving his own brokerage account. [AC ¶ 36 (Nov.1992)]

. . . .

38. In late 1992, Fruehauf hired a new president, Thomas Roller ("Roller"). *Defendants represented to Roller that Fruehauf was financially sound, and consistent with the disclosures they had caused Fruehauf to publicly disseminate.* Once at Fruehauf, however, Roller discovered that Fruehauf did not have the cash available to make payroll; that Fruehauf's inventory was inadequate; that vendors were not being currently paid; and that the company faced a serious problem of partially built trailers sitting stationery [sic] in the company's factories for lack of parts. [AC ¶ 38 (Dec.1992)]

. . . .

43. Defendants had so manipulated the company's books and records that *it took Fruehauf a year to reissue adjusted financial statements.* By way of filings in March 1995, Fruehauf corrected and revised its Form 10–Q for the periods ended March 31, June 30, and September 30, 1994. These new statements reflected Fruehauf's actual financial results restated and consolidated from the date of the 1989 Acquisition through December 31, 1992 (the "Restatement"). The Restatement reflected the effects on Fruehauf's reported net income:

| Year | Original Reported Net income (loss) | 1995 Restated Net income (loss) | Difference |
|---|---|---|---|
| 1990 | ( 2,176,000) | (51,066,000) | (48,890,000) |
| 1991 | (28,876,000) | (73,125,000) | (44,249,000) |
| 1992 | (65,160,000) | (47,448,000) | 17,712,000 |

The increase in 1990 and 1991 losses on a restated basis resulted primarily from the impact of applying correct accounting treatment for Fruehauf's restructuring-related costs and including previously excluded losses of businesses held for sale as previously alleged. [AC ¶ 43 (March 1994) ]

Moreover, the Amended Complaint alleges that the fraudulent concealment continued through March 1994 (with emphasis added):

67. *Defendants concealed their wrongdoing from the public* by use of the false accounting statements detailed heretofore and by their domination and control of the Fruehauf board of directors. The defendants continued to dominate and control Fruehauf by reason of the board of director positions they held or controlled or by reason of Lenz' position as dominant shareholder through at least December 1993. *Defendants' fraudulent concealment of their wrongdoing continued until at least March 1994,* when Fruehauf's prior auditor notified Fruehauf that its previously unqualified audit reports on Fruehauf's 1989, 1990, 1991 financial statements could no longer be relied upon and were withdrawn. In fact, until the company announced in March 1995 its decision to restate its financial statements, Fruehauf's statements filed through March 1995 were continuing representations of the truth of their content and known to be false by Defendants and never acknowledged by them as false. [AC ¶ 67 (March 1994)]

68. *Defendants intentionally and falsely asserted to the public until at least March 1994* that the financial records of Fruehauf were kept according to GAAP accounting principles and that such records fairly and completely reflected operations of the company. De-

fendants intentionally and falsely represented to the public that criticisms of certain of the company's accounting practices were unfounded and that the company had benefitted from prudent accounting management while under Defendants' control. [AC ¶ 68 (March 1994)]

From what has been quoted above, it is clear the Amended Complaint adequately alleges affirmative acts of fraudulent concealment, sufficient to toll the statute until at least March 1994, which would make the claims timely filed within three years, on the effective filing date of October 7, 1996.

(2) **Inquiry Notice**

 The statute of limitations ceases to be tolled when the plaintiff is put on inquiry notice of the alleged wrongs. *Dean Witter*, 1998 WL 442456 at \*6. A plaintiff has inquiry notice when, given all of the facts, a person "exercising reasonable diligence should have discovered his injury." *See id.* Disclosure of wrongful acts in publicly filed documents such as annual reports is deemed to put a plaintiff on inquiry notice of the wrongful acts. *See id.* at \*9; *Seidel v. Lee*, 954 F.Supp. 810, 817 (D.Del.1996); *In re USACafes, L.P. Litigation*, 1993 WL 18769, \*3–6 (Del.Ch. 1993).

Defendants argue the Plaintiffs were on inquiry notice more than three years before the effective filing date of the Amended Complaint, as a result of information available in public filings. Specifically, Defendants contend that each and every allegation of wrongdoing in the Amended Complaint was disclosed in a publicly filed document on or before August 31, 1993.

Plaintiffs counter that they could not discover any of these violations until March 1994 because of concealment by the Defendants. AC ¶¶ 43, 46. The Court has conducted a careful review of each allegation of the Amended Complaint and the publicly filed documents submitted by the parties in connection with this motion. For a significant number of these allegations, the Defendants have not pointed to and the Court has not discovered any disclosure sufficient to put the Plaintiffs on inquiry notice of the alleged wrongful acts. Since these allegations are sufficient to support all of the claims in the Amended Complaint, the Court holds that the statute of limitations must be tolled until March 1994, the time the Plaintiffs first allege they discovered the wrongful acts.

First, the Plaintiffs were not on inquiry notice of the acts alleged in AC ¶ 48, regarding certain accounting violations involving improper purchase accounting reserves.[14] Plaintiffs allege that this violation was fraudulently concealed by Defendants until at least March 1994. Defendants have pointed to no public filing which purports to disclose this alleged wrong. Nor has the Court been able to locate any disclosure in the voluminous appendices of public filings submitted by the parties. Reading the Amended Complaint in the light most favorable to the Plaintiffs, the Court concludes Plaintiffs were not on inquiry notice of this violation until they discovered the violations in March 1994.

Second, the Plaintiffs were not on inquiry notice of the allegations of insider trading in AC ¶¶ 53–55.[15] Again, Defendants have not pointed to and the Court has been unable to locate any public disclosure

---

**14.** AC ¶ 48 reads:

*Improper Purchase Accounting Reserves* In accounting for the 1989 Acquisition, Defendants caused Fruehauf to establish large reserves (liabilities) for future costs of disposition and then to understate expenses of subsequent periods by improperly charging expenses against these reserves, instead of reflecting the costs as operating expenses in Fruehauf's income statement. Recording future costs as liabilities assumed in the

1989 Acquisition artificially enhanced reported earnings subsequent to the 1989 Acquisition because certain subsequent expenditures are recorded as reductions in these liabilities instead of being recognized as current period expenses. This exclusion of expenses from the results of operations falsely increases reported earnings for subsequent periods in 1990 and 1991.

**15.** The insider trading allegations read:

of these insider trading allegations. Therefore, according to the Amended Complaint, Plaintiffs were not on inquiry notice of these alleged violations before they were actually discovered in March 1994.

Next, AC ¶ 20 contains allegations that Defendants publicized a strong turnaround for Fruehauf while knowing that it was having serious financial problems.[16] As evidence of public disclosure of these allegations, Defendants have pointed only to the Rebenstock Amended Complaint, D5. However, the Rebenstock Amended Complaint was not filed until January 23, 1995, well after March 1994, the date that

Plaintiffs allege they actually discovered the wrongful acts. Therefore, the Rebenstock Amended Complaint did not put the Plaintiffs on inquiry notice prior to March 1994. Moreover, the Court has been unable to locate any other public document in the appendices which discloses these allegations. It follows Plaintiffs were not on inquiry notice of this alleged wrongful act prior to March 1994.

Similarly, Plaintiffs were not on inquiry notice of the alleged misrepresentations made by the Defendants in connection with the 1991 initial public offering ("IPO") of Fruehauf stock.[17] Defendants first point to purported disclosures of

---

53. Defendants sold stock they held in Fruehauf and Terex at various times from 1991 through 1993, from which sales they realized millions of dollars in gains. During 1991 and thereafter, and with knowledge of the improper accounting and false disclosures alleged herein, Lenz exercised warrants and stock of Fruehauf. During 1993 and with knowledge of the improper accounting and disclosure alleged herein, Lenz, Terex and Rosenberg sold substantial amounts of shares of common stock of Fruehauf.

54. At the time the Defendants sold stock, the market value of Fruehauf stock did not reflect facts, well known to Defendants, that they had manipulated Fruehauf's accounting procedures to falsely enhance Fruehauf's financial performance. Long after Defendants sold such stock the public learned that Fruehauf's prior financial reports would be withdrawn and the company would be compelled to restate its financials. When the marketplace learned that these accounting deceptions had masked Fruehauf's true financial performance, the value of Fruehauf's stock decreased dramatically.

55. Defendants' continuous acts to manipulate Fruehauf's accounting, among other things, allowed them to avoid Terex having to disclose in its own financial statements and public filings the true facts of Fruehauf's poor performance. As a result the market prices of Terex stock were also artificially inflated in substantial amounts. Lenz, who was a large holder of Terex stock, sold Terex stock into the market during this period. During 1990 through 1993, with knowledge that the market prices of Terex stock were artificially inflated by reason of its ownership in an overvalued Fruehauf, Lenz sold substantial

blocks of his Terex stock at prices substantially in excess of its fair value for his personal gain.
AC ¶¶ 53–55.

16. AC ¶ 20 reads:

Following the 1989 Acquisition and under Lenz's control, Fruehauf began publicizing what portrayed as efforts to restructure its operations and pare down its debt. Defendants claimed to have caused a strong turn around with positive results, purportedly for Fruehauf. In reality, Fruehauf was suffering significant losses. The economic recession of the early 1990's deeply affected trailer sales, and the entire trailer industry, including Fruehauf, suffered as a result. Instead of applying cash to revive the business of Fruehauf, Defendants instead diverted sums for their own benefit.

17. These allegations read:

30. Notwithstanding their knowing that Fruehauf was in default of its loans and could no longer raise additional cash, Defendants announced the "turnaround" at Fruehauf and sought capital from the public markets through an initial public offering ("IPO") of Fruehauf stock.

31. In order to raise funds in the public market, Defendants needed to continue the materially misleading impression that Fruehauf's debt was under control; that Fruehauf's restructuring was proceeding according to plan; that a "turn around" had occurred; and that the company's future prospects under Defendants' leadership and control were positive.

32. The IPO's prospectus, dated July 8, 1991, optimistically portrayed Fruehauf's future. These statements were false be-

these wrongful acts in the 1995 Rebenstock Amended Complaint. Again, because this document was filed in April 1995, it could not put the Plaintiffs on inquiry notice before March 1994. Defendants also point to purported disclosures found in the Fruehauf September 1992 Form 10-Q (D42 at 9-10) and to the Fruehauf March 1993 Form 10-Q (D45 at 5). However, these documents make no mention and are insufficient to put a reasonable person on inquiry notice of the alleged misrepresentations underlying the IPO. Moreover, the Court has been unable to locate any disclosure of these alleged violations in the appendices submitted by the parties. It follows, the Plaintiffs were not on inquiry notice of the alleged wrongful acts in connection with the IPO.

In addition, AC ¶ 23 contains allegations that the Defendants damaged Fruehauf's long term business interests by selling real estate at substantially less than market value and firing all Fruehauf mechanics.[18] As evidence of public disclosure of these alleged wrongful acts Defendants point to a Fruehauf 1992 Form 8, filed December 22, 1992 (D38 at 4), and to the Fruehauf 1993 10-K, filed April 30, 1993 (D39 at 4-6). However, neither of these documents mention any sale of real estate. Also, while these documents do discuss conversion of the service business into independently owned dealerships, they make no mention of firing all of the service mechanics. The Court concludes that a reasonably prudent businessman would not investigate real estate sales or firing of mechanics based upon these disclosures. Accordingly, Plaintiffs were not on inquiry notice of these alleged wrongful acts prior to their actual discovery in March 1994.

For all of the other allegations in the Amended Complaint, the Defendants point to purported public disclosures in a variety of publicly filed documents.[19] Upon reviewing these materials, the Court con-

---

cause Defendants knew Fruehauf had liquidity problems and that Fruehauf's purported "turn around" of profitability that they had trumpeted [sic] the false product of the accounting improprieties.

33. Defendants knew but kept secret their motivations for the IPO, which were (i) to cure temporarily the known and existing liquidity problem of Fruehauf's noncompliance with the minimum net worth and profit requirements under its bank credit facility; (ii) to obtain waivers and/or decreased levels of certain negative financial covenants prior to the offering in order to avoid imminent default on, among other things, the minimum income covenant of its bank credit facility; and (iii) to secure a substantial portion of the IPO proceeds to recoup their initial investment in Fruehauf.

34. Defendants thereafter were able to sell four million shares in Fruehauf and apply a substantial part of the proceeds to further their own interests. Some $2.7 million of the proceeds was paid to Terex and $5.5 million was paid to KCS, both Lenz-controlled entities. Even after the 1991 IPO and other transactions, however, Fruehauf remained subject to the control of Lenz and Terex.

35. Under Defendants' continuing control, Fruehauf continued deteriorating during 1992 and 1993. The IPO did not provide the company with sufficient new working capital since the proceeds of the IPO were used in part to benefit Defendants by paying down Defendants' 1989 Acquisition debt.
AC ¶¶ 30-35.

18. AC ¶ 23 alleges, in pertinent part:

Defendants' engaged in a series of other business decisions that were calculated to create short-term cash flow and the appearance of profitability, to the detriment of the Company's long-term interests. For example, Defendants caused Fruehauf to sell real estate for an amount considered to be substantially less than fair market value. They directed that all mechanics in Fruehauf branches be fired, notwithstanding that this service work was providing one of the better sources of revenue for Fruehauf and could absorb most of the overhead of the company's branch offices.

19. The following table summarizes the allegations in the Amended Complaint and the place in the appendices where the acts are purportedly disclosed:

| Allegation in AC | Purported Public Disclosure |
| --- | --- |
| Failure to Exercise Due Diligence in Acquiring Fruehauf (July 1989) | Fruehauf 1991 10-K (D34 at 4, 8); |

cludes that these documents present closer questions of whether the disclosures are sufficient to put the Plaintiffs on inquiry notice. However, the Court need not decide whether Plaintiffs were on inquiry notice of the other claims because the allegations discussed above are, by themselves, sufficient to support the claims alleged in the Amended Complaint.

Count 1 of the Amended Complaint alleges breach of fiduciary duty by, *inter* *alia*, "improper accounting methods."; "realizing improper gains from insider gaining"; "selling or transferring corporate assets for less than adequate consideration"; and "engaging in self-interested transactions." AC ¶ 74. Count 2 alleges negligent misrepresentation by "ma[king] untrue representations of fact and omitt[ing] certain material facts regarding, among other things, the financial status of Fruehauf and its profitability, net worth, hold-

| | |
|---|---|
| Assumption Agreement: Fruehauf assumes "trailing liabilities" of Old Fruehauf (AC ¶ 17) | Fruehauf Sept. 1991 10-Q (D46 at 42) |
| D's failed to exercise due diligence in acquiring Fruehauf (AC ¶ 19); | P31 at B00280-81: |
| **KCS Agreement** (July 1989) Fruehauf enters management agreement with KCS Industries to pay KCS $300,000/month for legal, financial, and management services (AC ¶ 18) | Fruehauf 1991 10-K (D34 at 31-32); Fruehauf 1992 Notice of Annual Meeting (D37 at 8-9) Fruehauf 1992 10-Q (D42 at 5-6) D49 at 12 P31 at B00310-11. |
| **Decision to Self Insure** (1989-1992): D's decide to self insure (AC ¶ 21) | Fruehauf 1992 10-K (D39 at 24, n. L) |
| **Sale of Distributor's Network** (1989-1992):(AC ¶ 21) | Fruehauf 1991 10-K (D34 at 4, 6, 79) |
| **Reduction in Inventory Levels** (1989-1992): leaving half built trailers in factories (AC ¶ 22) | Fruehauf March 1993 10-Q (D45 at 3-4) D42 at 5 |
| **Paying KCS Management Fees** (1989-1992): D's paid KCS instead of vendors (AC ¶ 22) | Fruehauf 1991 10-K (D34 at 31-32) 1992 Annual Meeting Notice (D37 at 8-9) Sept. 1992 10-Q (D42 at 5-6) |
| **Refusing to Let Audit Committee Meet** (1989-1992): | audit committee met once in 1991 and 3× in 1992 (D37 at 3; D41 at 2) |
| D's refuse to let Audit Committee meet (AC ¶ 23) | no documentation of meeting in 1989 or 1990 |
| **Firing Outside Auditors** (1992): Deloitte & Touche (AC ¶ 23) | 1992 8-K (D52 at 2) |
| **Purchase Accounting Violations** (1989-1992): D's manipulate ac- | Terex 1989 10K D17 at 2-3, 7, 9 Terex June 1989 10Q D16 at 2 |

| | |
|---|---|
| counting, in violation of GAAP (including purchase accounting violations), to conceal deteriorating financial condition (AC ¶ 28, 46) D's improperly account for assets held for sale (AC ¶ 47); | Terex 1989 Form 8 D18 at 6, 10 Terex Sept. 1989 10Q D19 at 2 Terex 1990 10K D23 at 4, 6] 1992 10-K Deloitte & Touche state that financial statements comply with GAAP (1992 10-K D39 at 15) ] D22 at 7, 9. |
| **Release of Pension Reserve into Income** (1991): D's improperly uncap and recap pension benefits and release the money into income (AC ¶ 49-50) | June 1991 10Q (D32 at 2) amortization of pension benefits disclosed in Nov. 1991 Form 8 (D28 at 2) D30 at 1 D52 at 2 |
| **Violating Loan Covenants:** (1990-1991): in Fruehauf loan agreements (AC ¶ 24) | March 1992 Form 8 (D31 at 3) 1991 10-K (D34 at 12, 26) |
| **Altering Loan Covenants** (1990-1991): D's violate altered loan covenants by overstating income (AC ¶ 25); | D31 at 3 D34 at 4 D35 at 4 P30 at ¶¶ 58, 86, 148 |
| **Failure to Seek Chapter 11 Protection** (1991): (AC ¶ 26) | D42 at 9-10 D45 at 5 |
| **Reclassifying Outstanding Debt Covenants as Long Term Debt** (1991): (AC ¶ 51); | D31 at 3 D34 at 12, 26 D35 at 4 |
| **Secretly Liquidating Securities** (March & Nov. 1992): Lenz secretly liquidates $1 million of marketable securities (AC ¶ 36) Lenz secretly liquidates $622,000 of marketable securities (AC ¶ 36) | 1992 10-K (D40 at 3-4) 1993 Notice of Annual Meeting (D41 at 4) ] |

ings, and insolvency." AC ¶ 77. Counts 3, 4, 5, and 6 allege gross negligence and mismanagement, unjust enrichment, aiding and abetting breach of fiduciary duty, and breach of a contract to provide "undivided and loyal service," respectively, by the same acts as recited in Counts 1 and 2 and in the rest of the Amended Complaint. AC ¶¶ 83, 87, 91, 92–93. These claims are supported by the non-disclosed wrongful acts, described above, of accounting violations, insider trading, misrepresentations in the IPO, false publicity, selling real estate at less than market value, and firing the mechanics.

On this Motion to Dismiss the Court must read the Amended Complaint and the documents discussed above in the light most favorable to the Plaintiffs. At this stage of the litigation, a favorable reading of the Amended Complaint and the limited record leads to the conclusion that the allegations are sufficient to allege the Defendants fraudulently concealed and the Plaintiffs were not on inquiry notice of the above mentioned wrongful acts until March 1994. Therefore, at this stage, it is appropriate to toll the statute of limitations until that date. Accordingly, the Court holds the Amended Complaint to be timely filed on its effective filing date of October 7, 1996, less than three years after Plaintiffs acquired notice of the wrongful acts.

### c. Tolling Due to Equitable Tolling

 Plaintiffs argue and the Court agrees that the statute of limitations also should be tolled under the doctrine of equitable tolling. Under this doctrine, the statute of limitations is tolled until Plaintiffs are on inquiry notice if the complaint alleges "an abuse of the fiduciary relationship through actionable self dealing." *In re MAXXAM, Inc.*, 1995 WL 376942, *6 (Del.Ch.1995) (citing *Kahn v. Seaboard*

*Corp.*, 625 A.2d 269, 275–76 (Del.Ch.1993)); *see also Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del.1944).[20] A complaint alleging equitable tolling must set forth: (1) a fiduciary relationship; (2) actionable or fraudulent self-dealing; and (3) lack of inquiry notice. *See id.; see also Halpern v. Barran*, 313 A.2d 139, 142 (Del.Ch.1973).

 First, the Amended Complaint alleges fiduciary relationships between the Defendants and Fruehauf. As previously rehearsed, the Amended Complaint alleges that Lenz and Rosenberg were directors and officers of Fruehauf who owed fiduciary duties to Fruehauf. AC ¶¶ 4, 5, 71, 72; *Arnold*, 678 A.2d at 538. The Amended Complaint also alleges that Terex, as the dominant shareholder of Fruehauf, owed fiduciary duties to Fruehauf. AC ¶¶ 3, 16, 71, 72; *Kahn*, 638 A.2d at 1113. Thus, all Defendants were fiduciaries to Fruehauf.

Second, the Amended Complaint alleges Defendants engaged in actionable or fraudulent self dealing. One type of actionable self dealing, for equitable tolling purposes, is when a fiduciary of two corporations causes one corporation to pay money to the other for largely nonexistent services. *See Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, *14 (Del.Ch.1995). The Amended Complaint alleges Defendants, who were also fiduciaries of KCS, caused Fruehauf to pay KCS large sums of money for largely unperformed management and legal services. AC ¶¶ 18, 45. Another type of actionable self dealing, for purposes of equitable tolling, is insider trading. *See Strougo v. Carroll*, 1991 WL 9978, *3 (Del. Ch.1991). The Amended Complaint alleges that the Defendants also engaged in insider trading. AC ¶¶ 53–55. Therefore, Plaintiffs have alleged fraudulent self dealing by Defendants.

---

**20.** Defendants argument the doctrine of equitable tolling has been abandoned by the Delaware Supreme Court in actions seeking money damages is simply wrong. To the contrary, the cases cited by Defendants hold that the doctrine of equitable tolling is a valid theory of tolling the statute of limitations, even in cases involving money damages. *See Kahn*, 625 A.2d at 276–77; *Bokat v. Getty Oil Co.*, 262 A.2d 246, 250 (Del.1970).

Finally, as discussed in Section V.B.1.b.(2), *supra,* Plaintiffs were not on inquiry notice of these violations until at least March 1994. Thus, the statute of limitations will be tolled until that time under the doctrine of equitable tolling.

### 2. Release

In 1995, Fruehauf, Terex, Lenz, and Rosenberg were co-defendants in a class action *Rebenstock v. Fruehauf Trailer Corp. et al.,* and executed a Release as part of a Stipulation of Settlement:

> Upon the Settlement Effective Date, *each Settling Defendant releases and forever discharges each other Settling Defendant from any and all claims, rights of action and causes of action arising out of the Litigation only.* Claims arising out of or relating to other relationships or transactions between and among the Settling Defendants including, by way of example but not limitation, loan and margin transactions, account relationships, and investment banking relationships other than the initial public offering of Fruehauf common stock on June 28, 1991, are not released herein nor are any claims which may arise out of a violation of this Stipulation.

*Rebenstock v. Fruehauf Trailer Corp. et al.,* C.A. No. 92–CV–77050–DT (E.D.Mich. June 15, 1995), D6 at 20. Defendants contend the Release bars state law claims that arise from the same set of operative facts or the same factual predicate as the *Rebenstock* Litigation. Plaintiffs counter that the Release is limited to cross-claims for contribution or indemnity which could have been raised in the *Rebenstock* Litigation. The dispute is therefore narrowed to determining the meaning of the phrase "arising out of the Litigation only." For the following reasons, the Court concludes that the meaning of the Release is ambiguous and cannot be resolved on a motion to dismiss.

The Release is interpreted according to state law. *See Williams v. Stone,* 109 F.3d 890, 893 (3d Cir.1997). Although the parties did not raise it, there is an issue of which state law governs interpretation of the Release. Gauging from the cases cited in the briefs, the parties have assumed the law of Delaware, the state in which this action was brought, is the governing law. However, the Stipulation of Settlement recites that the Release is to be governed by the law of Michigan.[21] The Court need not resolve this choice-of-law issue because interpretation of the Release is the same under both Delaware and Michigan law. *See Williams,* 109 F.3d at 893.

Under Delaware law, the intent of the parties, as ascertained from the language of the document, controls interpretation of a release. *See Adams v. Jankouskas,* 452 A.2d 148, 155–56 (Del.1982). If the language of a release is clear and unambiguous then the Court must follow that interpretation. *See id.* If a release is ambiguous its interpretation becomes a question of fact and the fact finder may consider extrinsic evidence. *See Tucker v. Albun, Inc.,* 1999 WL 1241073, *3 (Del.Super.1999); *Rochen v. Huang,* 1989 WL 5374, *1 (Del.Super.1989). A release is ambiguous if it is reasonably susceptible to more than one construction. *See Tucker,* 1999 WL 1241073 at *5.

Similarly, under Michigan law, the scope of a release is governed by the intention of the parties as discerned from the plain language of a release. *See Rinke v. Automotive Moulding Co.,* 226 Mich. App. 432, 573 N.W.2d 344, 345–46 (1997).

---

**21.** Paragraph 10.8 provides:
 Except insofar as federal law is controlling, this Stipulation shall be construed, interpreted, and enforced in accordance with, and be governed by, the laws of the State of Michigan.

D6 at 36–37. Federal law does not govern even if the release is asserted as a bar to federal law claims. *See Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 892 n. 15 (3d Cir.1975).

The court follows the plain meaning of a release if the text is unambiguous. *See id.* When a release is ambiguous, its interpretation becomes a question for the trier of fact. *Stitt v. Mahaney*, 403 Mich. 711, 272 N.W.2d 526, 527 (1978). A release is ambiguous if it is reasonably susceptible to more than one meaning. *See Gortney v. Norfolk & Western Railway Co.*, 216 Mich. App. 535, 549 N.W.2d 612, 615 (1996).

 The language, "arising out of the Litigation only," is ambiguous because it is reasonably susceptible to more than one meaning: (1) claims arising out of the same set of operative facts as the facts alleged in the *Rebenstock* class action, or (2) cross-claims for indemnification or contribution based on the federal securities law claims alleged in the *Rebenstock* class action. First, the Stipulation of Settlement does not explicitly define "Litigation," but instead uses it broadly to refer to "the above captioned class action." D6 at 1. It is not clear whether "the above captioned class action" refers to the set of operative facts alleged in the *Rebenstock* Second Amended Complaint ("RSAC") or to merely the federal securities law claims alleged in the RSAC. If it means the former, then the claims "arising out of" the same set of operative facts may be barred. However, if it means the latter, then only cross-claims for indemnification or contribution may be barred. Moreover, it is not at all clear how the use of the term "only" after "Litigation" affects the meaning of the term "Litigation" and the scope of the release.

In addition, the next sentence of the release, which carves out certain non-released claims, casts further doubt on the scope of the release.[22] This carve out provision excludes claims based on "investment banking relationships other than the initial public offering of Fruehauf common stock." This phrase may imply that the Release only covers claims arising out of the set of operative facts related to the Fruehauf IPO or to cross claims for indemnification or contribution based upon the Fruehauf IPO. However, since the RSAC also contains factual allegations apart from the Fruehauf IPO, this carve out provision casts doubt on the scope of the Release.

Finally, the Delaware cases cited by Defendants fail to unambiguously support the construction proffered by Defendants. In *In re Fuqua Industries, Inc. Shareholder Litigation*, the court interpreted the release language "arise out of, under, or in connection with the acquisition of Georgia Federal" to include claims arising from the set of operative facts surrounding the acquisition of Georgia Federal. *See* 1997 WL 257460, *5–*6 (Del.Ch.1997). Similarly, in *In re Union Square Associates Securities Litigation*, the court construed the release language "arising in any way in connection with purchases of Units of partnership" to mean any claims related to the same factual predicate as the partnership unit sale. *See* 1993 WL 220528, *3 (Del. Ch.1993). In each of these cases, the release related to claims arising out of a particular transaction: the acquisition of Georgia Federal or the purchases of Units of partnership. In contrast, the Release uses the term "Litigation only" rather than defining a set of transactions or occurrences. Since the language "Litigation only" could refer to the transactions or only to the federal securities law claims, the scope of the Release is ambiguous. It follows, the Release must be interpreted by the trier of fact and the Amended Complaint will not be dismissed based upon Fruehauf having signed the Release.

---

**22.** "Claims arising out of or relating to other relationships or transactions between and among the Settling Defendants including, by way of example but not limitation, loan and margin transactions, account relationships, and investment banking relationships other than the initial public offering of Fruehauf common stock on June 28, 1991, are not released herein nor are any claims which may arise out of a violation of this Stipulation." D6 at 20.

Even if Defendants are correct and the Release unambiguously covers all claims arising out of the same set of operative facts as the RSAC, the Release would not unambiguously cover all of the claims in the Amended Complaint. The Amended Complaint alleges at least three sets of operative facts which are not recited in the RSAC: (1) improprieties surrounding the KCS management agreement;[23] (2) illegal corporate loan transactions;[24] and, (3) insider trading after the IPO.[25] Plaintiffs have not pointed to and the Court has been unable to locate any factual allegations in the RSAC that involve these three sets of operative facts. Therefore, even if the Release unambiguously releases all claims arising out of the same set of operative facts as those alleged in the RSAC, the Amended Complaint contains different factual allegations. For these reasons, the Amended Complaint will not be dismissed because of the Release.

### 3. Business Judgment Rule

▮▮▮▮ Defendants assert Plaintiffs' state law claims fail as a matter of law because they fail to rebut the presumption of the business judgment rule. The Delaware business judgment rule is a pre-sumption "that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Cede & Co., Inc. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del.1993) (internal quotations eliminated). "The business judgment rule shields corporate decision-makers and their decisions from judicial second-guessing where the five elements of the rule—a business decision, disinterestedness, due care, good faith, and no abuse of discretion—are present." Dennis J. Block, et al., The Business Judgment Rule: Fiduciary Duties of Corporate Directors and Officers, 9 (1987). The Amended Complaint contains sufficient allegations of these five elements to preclude dismissal for failure to rebut the business judgment rule.

### 4. Breach of Fiduciary Claims Against Terex and Lenz

Defendant asserts that the breach of fiduciary duty claims against Terex and Lenz must be dismissed because they were both minority shareholders, and not directors or officers, after August 1993 and,

**23.** AC ¶ 18:

18. As part of the 1989 Acquisition, Old Fruehauf and Fruehauf also entered into an [sic] a management agreement with KCS Industries whereby KCS purported to provide legal, financial and management services to Fruehauf in order to receive approximately $300,000 each month. KCS, which was owned and operated by Defendant Lenz, did not provide services to Fruehauf of a value commensurate with the fee it extracted from Fruehauf, or that Fruehauf was not already obtaining from other professionals.

**24.** AC ¶¶ 36–37:

36. Defendants continued their use of Fruehauf against the company's best interests. For example, in March 1992, without the knowledge of Fruehauf's financial staff, Board of Directors, or Audit Committee, Lenz liquidated $1 million worth of Fruehauf's marketable securities. In November 1992, again acting in secret and without the knowledge of Fruehauf's financial staff, Board of Directors, or Audit Committee, Lenz liquidated and utilized an additional $622,000 worth of Fruehauf's marketable securities. These funds were combined with the $1 million he had earlier appropriated and were used to post an appeal bond for the personal benefit of Lenz in litigation a brokerage firm had brought against him involving his own brokerage account.

37. Although the Fruehauf Board of Directors, under the control of Defendants, later purported to "ratify" Lenz's actions, the Board nevertheless insisted that Lenz return the value of the securities he had appropriated. Lenz then caused Terex to pay $1.6 million to Fruehauf, with the sum purportedly reimbursed by one of Lenz's companies. The funds were repaid to Fruehauf with interest at rates ranging from 6% to 8%. At the time of liquidation, however, the $1 million and the $622,000 bonds were enjoying annual yields in excess of 13% and 10%, respectively.

**25.** AC ¶¶ 53–55. *See, supra,* note 15.

thus, owed no fiduciary duties to Fruehauf after that date. The Court need not reach the question of whether Terex and Lenz owed Fruehauf fiduciary duties after August 1993 because the Amended Complaint alleges they breached their fiduciary duties prior to August 1993. Since the Court has ruled that the pre-August 1993 allegations are not time barred by the statute of limitations, they are sufficient to support the claims. As such, the state law claims for breach of fiduciary duty will not be dismissed.

### 5. Preexisting Duty Rule

Defendants urge dismissal of the breach of contract claim in Count 6 because the contracts are unenforceable as they simply require Lenz and Rosenberg to perform pre-existing legal duties. Count 6 alleges that Lenz and Rosenberg breached "contracts with Fruehauf under which they were required to provide Fruehauf with their expertise and undivided and loyal service." AC ¶ 93. Defendants contend that Lenz and Rosenberg already had a legal duty to provide their expertise and undivided and loyal service under Delaware law. Plaintiffs do not contest this position.

 Under the Delaware pre-existing duty rule, a contract is unenforceable insofar as it calls upon one of the parties to perform a duty which it is already legally obligated to perform. *See Seidel v. Lee,* 954 F.Supp. 810, 817 (D.Del.1996); *The Continental Ins. Co. v. Rutledge & Co., Inc.,* 750 A.2d 1219, 1232–33 (Del.Ch. 2000). In *Seidel,* the complaint alleged breach of a contract requiring the defendant to comply with federal securities laws. *See Seidel,* 954 F.Supp. at 817. Since the defendant was already legally

obligated to comply with the federal securities laws, the court dismissed the breach of contract claim "to the extent that Plaintiff's contract claim is premised upon the alleged securities violations." *Id.* at 817–18. However, the court also allowed the plaintiff to "pursue this claim to the extent that it is based upon a breach of other obligations." *Id.*

 Likewise, as fiduciaries, Defendants owed Plaintiffs pre-existing legal duties of due care, good faith, and loyalty. *See Cede,* 634 A.2d at 361. It follows, Count 6 will be dismissed to the extent that it is premised upon breaches of the duties of due care, good faith, and loyalty. However, Plaintiffs may pursue Count 6 to the extent that it is based upon breach of other contractual obligations.

### 6. Rule 9(b)

Defendants assert Plaintiffs' Amended Complaint must be dismissed for failure to comply with Fed.R.Civ.P. 9(b) which requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Defendants contend that, although the state law claims are not formally fraud claims, the underlying allegations sound in fraud and are not pled with sufficient particularity. *See Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984). The Court finds that, to the extent Rule 9(b) applies to Plaintiffs' claims, the circumstances surrounding the fraud are pled with the requisite particularity.

 Although there is a dearth of case law, the Rule 9(b) heightened pleading requirement generally does not apply to the state law claims of breach of fiduciary duty,[26] negligent misrepresentation,[27]

---

**26.** *Compare Official Committee of Unsecured Creditors v. Shapiro,* 1999 WL 729267, *5 n. 13 (E.D.Pa.1999) (Rule 9(b) does not apply to breach of fiduciary duty claims); *Kaiser v. Stewart,* 1997 WL 476455, *15–16 (E.D.Pa. 1997) (same); *U.S. v. Kearns,* 595 F.2d 729, 733 n. 18 (D.C.Cir.1978) (same) *with Thorn-*

ton v. Evans, 692 F.2d 1064, 1083 (7th Cir. 1992) (Rule 9(b) applies to breach of fiduciary duty claims grounded in fraud).

**27.** *Compare In re Cendant Corp. Securities Litigation,* 190 F.R.D. 331, 337 (D.N.J.1999) (Rule 9(b) does not apply to negligent misrep-

gross negligence,[28] mismanagement,[29] unjust enrichment,[30] aiding and abetting breach of fiduciary duty,[31] and breach of contract.[32] However, Rule 9(b) does require particular pleading of fraudulent concealment as a tolling theory to counter the affirmative defense of statute of limitations. *See Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir.1993); *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984).

▮▮▮ The allegations of fraudulent concealment and other circumstances of fraud—to the extent they underlie the state law claims—are pled with sufficient particularity to satisfy Rule 9(b). The purpose of Rule 9(b) is to place Defendants on notice of the precise misconduct with which they are charged, and to safeguard Defendants against spurious charges of fraudulent behavior. *See id.* The Third Circuit courts take a "lenient approach" to the application of Rule 9(b). *Kronfeld v. First Jersey Bank*, 638 F.Supp. 1454, 1462 (D.N.J.1986). The Court should apply Rule 9(b) with some flexibility and should not require plaintiffs to plead issues that may have been concealed by defendants. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 657 (3d Cir.1998); *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 99 (3d Cir.1983). Although pleading the date of, place of, substance of, and person making each fraudulent act is sufficient to satisfy Rule 9(b), *see Christidis v. First Pennsylvania Mortgage*, 717 F.2d 96, 99 (3d Cir.1983); *Klapper v. Commonwealth Realty Trust*, 657 F.Supp. 948, 958 (D.Del.1987), a complaint need not plead the "date, place or time" of the fraud, so long as it uses an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *See Seville* at 791. In addition, "courts should be sensitive to the fact that application of [Rule 9(b) ] prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284–85 (3d Cir.1992) (internal quotations omitted).

As discussed in Section V.B.1.b, *supra*, AC ¶¶ 20, 25, 28, 30, 32, 36, 38, 43, 67, and 68 contain allegations of fraudulent concealment. The Court is satisfied that these allegations are injected with sufficient precision and substantiation to meet the heightened pleading requirements of Rule 9(b). Moreover, these allegations plead with particularity any fraud underlying the state law claims. Therefore, the state law claims will not be dismissed for failure to comply with the pleading requirements of Rule 9(b).

resentation claims); *Small v. Provident Life & Accident Ins. Co.*, 1998 WL 848112, *3 (E.D.Pa.1998) (same); *Massachusetts School of Law v. American Bar Assoc.*, 142 F.3d 26, 41 (1st Cir.1998) (same) *with Atlantic Richfield Co. v. Ramirez*, 176 F.3d 481, 1999 WL 273241, *1 (9th Cir.1999) (Rule 9(b) applies to claims for negligent misrepresentation).

**28.** *See Resolution Trust Corp. v. Farmer*, 823 F.Supp. 302, 309 (E.D.Pa.1993) (Rule 9(b) does not apply to claims for gross negligence).

**29.** *Compare Shapiro*, 1999 WL 729267 at *5 n. 13 (Rule 9(b) does not apply to mismanagement claims) *with In re Delmarva Securities Litigation*, 794 F.Supp. 1293, 1304 (D.Del. 1992) (Rule 9(b) does apply to mismanagement claims if fraud underlies claims).

**30.** The Court could locate only one case discussing the application of Rule 9(b) to claims for unjust enrichment. *See U.S. v. Arrow Medical Equip. Co.*, 1990 WL 210601, *5 (E.D.Pa.1990). In that case, the court assumed *arguendo* that Rule 9(b) did apply to a claim for unjust enrichment and concluded that the allegations of fraud were pled with particularity. *See id.* The Court will follow the same general rule of applying Rule 9(b) only when allegations of fraud underlie the claims.

**31.** *See* cases cited, *supra*, note 26.

**32.** *See Toner v. Allstate Ins. Co.*, 821 F.Supp. 276, 283 (D.Del.1993) (Rule 9(b) only applies to breach of contract claim if basis of claim is fraud).

## C. ERISA Claims

### 1. Personal Jurisdiction over Lenz and Rosenberg

■ Defendants Lenz and Rosenberg assert this Court lacks personal jurisdiction over them for purposes of the ERISA claims in Counts 7 and 8 of the Amended Complaint.[33] There are both statutory and constitutional limitations on a Court's exercise of personal jurisdiction over defendants. *See Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 292 (3d Cir.1985) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). The Court finds that both the statutory and constitutional dimensions of personal jurisdiction are satisfied with respect to the ERISA claims against Lenz and Rosenberg.

■ As to the statutory dimension, Fed.R.Civ.P. 4(e) ("Rule 4(e)") provides that a Court has personal jurisdiction over a defendant if he is served with process "pursuant to the law of the state in which the district court is located ... [u]nless otherwise provided by federal law." In this case, ERISA § 502(e)(2) supplies the governing federal law for the ERISA claims:[34]

> Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where the defendant resides or may be found, and *process may be served in any other district where a defendant resides or may be found.*

29 U.S.C. § 1132(e)(2) (emphasis added). In other words, ERISA § 502(e)(2) pro-

vides for nationwide service of process. *See Green v. William Mason & Co.,* 996 F.Supp. 394, 396 (D.N.J.1998). Because Lenz and Rosenberg were served with process within the United States, the statutory component of personal jurisdiction is satisfied.

■ Next, for these federal claims, the constitutional aspect of personal jurisdiction is governed by the due process clause of the Fifth Amendment. *See Max Daetwyler,* 762 F.2d at 293. The Fifth Amendment due process clause has been interpreted to incorporate the Fourteenth Amendment due process two prong test for personal jurisdiction. *Id.* First, the Court must ascertain whether " 'certain minimum contacts' exist between the nonresident defendant and the forum." *Id.* (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Second, the Court must ensure " 'that maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Id.* (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154).

As to the first prong, the parties dispute what is the relevant forum for evaluating Lenz's and Rosenberg's minimum contacts. Plaintiffs argue that, because ERISA § 502(e) provides for nationwide service of process, the Court should apply a "national contacts" test, i.e., analyze the contacts with the United States. Defendants assert the relevant forum is the state of Delaware, the state in which this Court sits.

The Circuit Courts of Appeals are divided on whether to use a national contacts analysis for personal jurisdiction when a federal statute provides for nationwide

---

**33.** Defendants do not contest personal jurisdiction as to the state law claims.

**34.** Lenz and Rosenberg argue that the Court lacks personal jurisdiction under the two provisions of the Delaware long arm statute, 10 Del.Code §§ 3104(c)(1), 3114, asserted as the basis for personal jurisdiction in Paragraphs 8 and 9 of the Amended Complaint. Plaintiffs do not dispute this contention. However,

Rule 4(e) is not limited to service under a state long arm statute where federal law provides for service of process. *See* Fed.R.Civ.P. 4(e). In this case, ERISA § 502(e)(2) supplies federal law providing for service of process. It also does not matter that Plaintiffs failed to plead the federal basis for personal jurisdiction since personal jurisdiction is an affirmative defense. *See* Fed.R.Civ.P. 12(h)(1).

service of process. *Compare Autoscribe v. Goldman,* 47 F.3d 1164, 1995 WL 56662 at *3 (4th Cir.1995) (apply a national contacts test); *Busch v. Buchman, Buchman & O'Brien,* 11 F.3d 1255, 1258 (5th Cir.1994) (same); *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.1993) (same); *United Electrical, Radio & Machine Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir.1992) (same); *Go-Video Inc. v. Akai Elec. Co., Ltd.,* 885 F.2d 1406, 1414–16 (9th Cir.1989) (same); *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671–72 (7th Cir.1987) (same); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 314–15 (2d Cir.1981) (same) *with Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206, 1211 (10th Cir.2000) (do not apply national contacts test); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 941 (11th Cir.1997) (same); *I.A.M. Nat'l Pension Fund v. Wakefield Industries, Inc.,* 699 F.2d 1254, 1257–58 (D.C.Cir.1983) (same). The Supreme Court has declined to resolve this issue. *See Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 111, 107 S.Ct. 1026, 94 L.Ed.2d 92 n. * (1987); *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 103 n. 5, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987).

■ Although the Third Circuit Court of Appeals has never squarely addressed this issue, it has implied that it would apply the national contacts theory when a federal statute provides for nationwide service of process. *See Max Daetwyler,* 762 F.2d at 293–94; *see also Green,* 996 F.Supp. at 396. In *Max Daetwyler,* the Court considered whether to apply a national contacts test on a federal claim where there was no applicable federal statute providing for nationwide service of process. *See Max Daetwyler,* 762 F.2d at 293. Although it declined to apply a national contacts test in that case, the Court held, in dicta, that "[t]he constitutional validity of national contacts as a jurisdiction-

al base is confirmed by those statutes which provide for nationwide service of process." *Id.* at 294 n. 3. Moreover, the Court reasoned that jurisdiction is determined, not by "the territory in which a court sits," but rather by "the geographical limits of the unit of government of which the court is a part." *Id.* at 293–94. Finally, the Court approvingly acknowledged the decisions of other Courts of Appeals which have held that a national contacts test is appropriate when there is a statute providing for nationwide service of process. *See id.* at 296–97. While not free from doubt, the Third Circuit Court of Appeals is likely to apply a national contacts test where the statute provides for nationwide service of process. In this case, all of the acts underlying the alleged violations of ERISA occurred within the United States. Therefore, Lenz and Rosenberg had sufficient minimum contacts with the United States to support personal jurisdiction in this Court.

As to the second prong of the constitutional analysis, the Court must ensure that maintenance of the suit in this district " 'does not offend traditional notions of fair play and substantial justice.' " *Id.* at 293 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154). Lenz and Rosenberg subjected themselves to suit in Delaware by committing the alleged ERISA violations in connection with their fiduciary responsibilities to Delaware corporations. Moreover, because this litigation stems from a bankruptcy case, Lenz and Rosenberg will have to litigate the state law claims in this District, regardless of whether the Court dismisses the ERISA claims. Therefore, it will not cause a substantial injustice to Lenz and Rosenberg to litigate the ERISA claims in this district. Accordingly, this Court will not dismiss the ERISA claims for want of personal jurisdiction over Lenz and Rosenberg.

**2. Statute of Limitations**

■ Lenz and Rosenberg contend the ERISA claims are time barred by the

statute of limitations on ERISA actions, 29 U.S.C. § 1113.[35] Under this statute of limitations, the action must be filed within the earlier of: (1) six years of the last act or omission, or (2) three years of the plaintiff acquiring "actual knowledge" of the violation.[36] *See id.* Thus, for each allegation, the Court must determine the date of the alleged violation and the date Plaintiffs acquired actual knowledge of the alleged violation. *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1178 (3d Cir.1992).

▮▮▮▮▮ "Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period." *Id.* at 1176. In order for the three year period to apply, the plaintiff must have actual, not constructive, knowledge. *See id.* Actual knowledge "requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts." *Id.* The defendant must make a showing of when the plaintiff acquired actual knowledge. *See International Union of Electronic, Elec., Salaried, Mach. and Furniture Workers, AFL–CIO v. Murata Erie North America, Inc.*, 980 F.2d 889, 900 (3rd Cir.1992). If the defendant cannot make such a showing, the Court will not dismiss the ERISA claims as barred by § 1113. *See id.*

Plaintiffs allege four sets of ERISA violations or prohibited transactions involving: (1) the Asset Acquisition Trust, AC ¶¶ 59–61; (2) the agreement with Richard Adams, AC ¶ 65; (3) Terex stock appreciation rights, AC ¶¶ 62–63; and, (4) loans from the Fruehauf Plan, AC ¶ 64. For each allegation, the parties agree that the action was filed within six years of the alleged violation. However, they dispute whether and when Plaintiffs acquired actual knowledge of each alleged violation. Reading the Amended Complaint in the light most favorable to Plaintiffs, the defendant has not made an adequate showing that Plaintiffs had actual knowledge of any of these violations more than three years prior to the effective filing date of this action, October 7, 1996.[37] Therefore, the Court will not dismiss the ERISA claims because of the statute of limitations.

### a. Prohibited Transaction Involving Asset Acquisition Trust

▮▮▮ Plaintiffs allege that, on March 31, 1993, Lenz directed Continental, trustee of the Master Trust, to invest $1 million of Master Trust assets in the Asset Acquisition Trust ("AAT"). AC ¶ 59. One asset of AAT was Connecticut Bank of Commerce, a bank partially owned by Lenz, and for which Lenz and Rosenberg served as directors. *Id.* On June 2, 1993, Continental discovered that this transaction was fiduciary self dealing, a conflict of interest, and a prohibited transaction under ERISA. AC ¶ 60. When Continental attempted to undo the transaction, Lenz fired Continental as trustee. AC ¶¶ 60–61. Defendants assert Plaintiffs' knowledge of

**35.** 29 U.S.C. § 1113 provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

**36.** The ERISA statute of limitations also provides that, if there is fraud or concealment, the action may be filed within six years after discovery of the violation. *See id.* However, unlike the state law claims, Plaintiffs do not allege fraud or concealment in connection with the ERISA claims.

**37.** As discussed in Section V.B.1.a, *supra*, the effective filing date of this action is October 7, 1996.

this transaction can be imputed from Continental's actual knowledge as of June 2, 1993. Plaintiffs counter that Continental's actual knowledge, as trustee for the Master Plan, cannot be imputed to them.

As previously rehearsed, under prevailing Third Circuit law, the ERISA statute of limitations "sets a high standard" for finding the three year period to be the applicable period. *See Gluck*, 960 F.2d at 1178. Applying a similarly high standard, other district courts have refused to impute knowledge from a trustee of a benefit plan to a successor trustee of the same plan, absent a showing of some relationship between the two trustees that makes imputation of knowledge reasonable. *See District 65 Retirement Trust v. Prudential Securities, Inc.*, 925 F.Supp. 1551, 1559, n. 8 (N.D.Ga.1996); *Useden v. Acker*, 734 F.Supp. 978, 980 (S.D.Fla.1989).

In this case, Lenz and Rosenberg urge imputation of knowledge from the trustee of the Master Plan, Continental, to the corporation which sponsored the Master Plan, Fruehauf, and then to the successor trustee to Fruehauf, End of the Road Trust. However, there has been no showing of a relationship between Fruehauf and Continental that would make imputation of knowledge reasonable. Indeed, the Amended Complaint alleges that the Defendants, without knowledge of Fruehauf, appointed Continental as trustee, directed Continental to make the alleged prohibited transaction, and fired Continental after it discovered the alleged prohibited transaction. AC ¶¶ 57–61. There is no evidence that Continental had any direct relationship with Fruehauf sufficient to impute knowledge. Absent such a showing, the Court will not apply the three year statutory period to the ERISA claims based on this transaction.

Lenz and Rosenberg seek refuge in several cases which impute knowledge from the directors and officers of a corporation to the corporation itself. *See Breed v. Dawson*, 1994 WL 1297871 (D.Me.1994); *Brandt v. Steel Hector & Davis*, 213 B.R.

406, 409–10 (S.D.Fla.1997) (non-ERISA case); *Bourns v. Wells Fargo Bank, N.A.*, 1994 WL 36998, *4 (N.D.Cal.1994). However, Lenz and Rosenberg have made no argument that the other directors and officers of Fruehauf had knowledge of the transaction which is imputable to Fruehauf. Moreover, the Amended Complaint alleges that Lenz and Rosenberg, directors of Fruehauf, actually took affirmative steps to conceal their alleged wrongdoing from the corporation. *See, e.g.*, AC ¶ 66. At this procedural stage, there is no reason to impute Lenz's and Rosenberg's knowledge of the transaction to Fruehauf and/or End of the Road Trust.

Finally, Lenz and Rosenberg argue that failure to impute knowledge from one trustee to a successor trustee will result in the absurd result of allowing a plaintiff to continuously revive a claim by continuing to appoint new trustees. This argument lacks merit because ERISA sets a maximum six year statute of limitations from the date of the last act, regardless of when and if a plaintiff acquires actual knowledge. *See* 29 U.S.C. § 1113. Therefore, appointing successive trustees will not infinitely toll the statute of limitations.

### b. Prohibited Transaction Involving Richard Adams

Plaintiffs allege that, in 1991, Lenz entered into an agreement with Richard Adams, allowing Adams to manage $750,000 of the Fruehauf Plan's assets, which Adams subsequently lost. AC ¶ 65. Continental discovered this allegedly prohibited transaction in 1991 and warned Defendants to discontinue the agreement. *Id.* As with the AAT transaction, Lenz and Rosenberg assert that Continental's actual knowledge should be imputed to Fruehauf and on to End of the Road Trust. For the same reasons discussed in the prior section, Lenz and Rosenberg have not made a sufficient showing to warrant imputation of this actual knowledge. Absent any additional showing of actual knowledge of this transaction by Plaintiffs, the Court will not

dismiss the ERISA claims based on this transaction.

### c. Prohibited Transaction Involving Stock Appreciation Rights

Plaintiffs allege that, in 1993, Lenz caused the Master Trust to invest in Terex stock appreciation rights ("SARs"), knowing the SARs were undervalued. AC ¶ 62. During division of the Master Trust into the Terex Trust and Fruehauf Trust in 1994, Lenz allocated the SARs entirely to the Terex Trust, a self dealing and prohibited transaction. AC ¶¶ 62–63. Defendants have not made any showing that any Plaintiff, or that even Continental,[38] had actual knowledge of this allegedly prohibited transaction. Absent such a showing, the Court will not dismiss the claims based on the three year statutory period. Accordingly, the ERISA claims based on this transaction were timely filed within six years of the 1994 violation.

### d. Prohibited Transaction Involving Fruehauf Plan Loans

Plaintiffs allege that in 1990 and thereafter, Lenz directed the Fruehauf Plan to loan money to or for the benefit of Fruehauf and Terex. AC ¶ 64. The loans were evidenced by notes consolidated into a letter of credit in 1993. *Id.* In 1995, the letter of credit was exchanged for Fruehauf senior secured notes. *Id.* Plaintiffs assert that all of these acts were prohibited transactions. *Id.*

Lenz and Rosenberg first argue that Fruehauf had actual knowledge of these transactions, by virtue of the publicly filed Fruehauf 1991 10–K (D34 at 32), Fruehauf 1992 10–K (D39 at 22), and Fruehauf Rule 424(b) Registration Statement (D51). A careful review of these documents, as well as the allegations in the Amended Complaint, does not conclusively reveal that Fruehauf had actual knowledge of the alleged transactions from these documents.

▮ Next, Lenz and Rosenberg appear to argue that, even if the six year period applies, the last act occurred in 1990, more than six years prior to the October 7, 1996 effective filing date of this action. Plaintiffs counter that the 1993 consolidation into the letter of credit and the 1995 exchange for senior secured notes represent continuing violations of ERISA so that the last act occurred in 1995. The test for whether subsequent acts constitute continuing violations is whether each overt act results in a new injury to the plaintiff. *See Kuhns v. Meridian Bancorp.,* 1993 WL 34786 (E.D.Pa.1993); *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan and Trust Agreement,* 822 F.Supp. 247, 259 (E.D.Pa.1993); Richard J. Link, Limitation of Actions, under § 413 of Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1113), with Respect to Action for Breach of Fiduciary Duty, 118 A.L.R.Fed. 377 (1994 & Supp. 2000). In this case, the facts are understandably insufficiently developed for the Court to determine whether the acts subsequent to 1990 represent a continuing violation. Reading the Amended Complaint in the light most favorable to Plaintiffs, they may represent a continuing violation, making the ERISA claims based on this transaction timely filed. Accordingly, the Court will not dismiss the ERISA claims based on this transaction.

### 3. Whether Rosenberg is ERISA Fiduciary

Rosenberg seeks dismissal of the ERISA claims, Counts 7 and 8, against him, asserting he was not a fiduciary of the Fruehauf Plan, Terex Plan, Master Trust, Fruehauf Trust, or Terex Trust (collectively "benefit plans"). Plaintiffs counter that there is insufficient evidence to conclusively determine that Rosenberg was not a fiduciary of the benefit plans and that

---

**38.** Although the Court suspects Continental was no longer trustee at the time of the division, the Amended Complaint simply does not state when Continental ceased functioning as trustee.

there are sufficient allegations in the Amended Complaint to support a conclusion that he was a fiduciary. The Court concludes that there is insufficient evidence on the record at this stage of the proceedings to warrant dismissal of the claims against Rosenberg based on his lacking fiduciary status.

Under ERISA § 3(21)(A) there are three types of fiduciaries:

(i) [one who] exercises any discretionary authority or discretionary control respecting *management* of such plan or exercises any authority or control respecting management or *disposition of its assets,* (ii) [one who] renders *investment advice* for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) [one who] has any discretionary authority or discretionary responsibility in the *administration* of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). As both parties concede, Rosenberg is not a type (ii) fiduciary, as there is no allegation he rendered investment advice. To determine whether he is a type (i) or (iii) fiduciary, the Court must determine whether Rosenberg had discretionary authority or control over "management" of the benefit plans, "plan assets," or "administration" of the benefit plans. *See Tybout v. Karr Barth Pension Admin., Inc.,* 819 F.Supp. 371, 378 (D.Del.1993) (citing *Confer v. Custom Engineering Co.,* 952 F.2d 34, 36 (3d Cir.1991)).

The Amended Complaint contains three sets of allegations to support Rosenberg's fiduciary status. First, it alleges that Rosenberg is a "fiduciar[y] ... as defined in ERISA." AC ¶ 96. Second, it alleges fiduciary status by way of his positions with Fruehauf and Terex. The Amended Complaint alleges: Fruehauf "sponsored" the Fruehauf Plan; Terex, Lenz, and Rosenberg established a trust to hold the assets of the Fruehauf Plan; the Fruehauf Plan and Terex Plan merged into a Master Trust; "Terex appointed Lenz as the sole member of the investment committee for the Master Trust"; and, "Fruehauf, in its fiduciary capacity," separated the Master Trust into the Fruehauf Trust and Terex Trust. AC ¶¶ 56–58. At the times of each of these transactions, it alleges "Rosenberg was the Secretary, and a Director of Fruehauf, and was the Secretary, General Counsel, and a Director of Terex." AC ¶ 5. Finally, the Amended Complaint alleges fiduciary status by way of his rendering legal advice. It alleges Rosenberg gave Continental a legal opinion on the legality of the transaction involving AAT and the Connecticut Bank of Commerce, while Rosenberg and Lenz were members of the Board of Directors of Connecticut Bank of Commerce. AC ¶ 59.[39]

As to the first allegation, simply alleging fiduciary status is insufficient to conclude that Rosenberg is a fiduciary. Instead, the "linchpin of fiduciary status" is whether the person exercises discretion over plan management, assets, or administration. *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 233 (3d Cir. 1994). ERISA broadly defines who is a fiduciary. *See id.* Determining whether someone is a fiduciary is a very fact specific inquiry which is difficult to resolve on a motion to dismiss. *District 46; Kramer v. Smith Barney,* 80 F.3d 1080, 1084 n. 2 (5th Cir.1996) (ERISA fiduciary status is mixed

**39.** AC ¶ 59 states:

On March 31, 1993, Lenz directed Continental to invest $1 million of Master Trust assets in an investment trust called the Asset Acquisition Trust Limited Partnership. One of the assets held by the Asset Acquisition Trust was Connecticut Bank of Commerce, a bank in which Lenz held an ownership interest, and in which both Lenz and Rosenberg served as members of the Board of Directors. Continental completed the investment of the $1 million in the Asset Acquisition Trust in reliance upon representations given by Lenz, and in reliance upon a purported March 31, 1993 "opinion of counsel" given by Rosenberg, that the transaction would not violate ERISA.

question of law and fact); *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1461 (9th Cir. 1995) (ERISA fiduciary status is question of fact); *District 65 Retirement Trust*, 925 F.Supp. at 1558 n. 7 (ERISA fiduciary status is mixed question of law and fact).

■■■ As to the second set of allegations, the corporate sponsor of a benefit plan, such as Fruehauf or Terex, is generally not a fiduciary. *See Malia v. General Electric Co.*, 23 F.3d 828, 833 (3d Cir.1994). However, a corporation may be a fiduciary if it exercises some discretion or control over the management, assets, or administration of the plan. *See Payonk v. HMW Industries, Inc.*, 883 F.2d 221, 231 (3rd Cir.1989) (Stapleton, J., concurring) (cited favorably in *Malia*, 23 F.3d at 833); *Curcio*, 33 F.3d at 233. In this case, the factual record is not developed well enough to determine whether Fruehauf and/or Terex exercised sufficient discretion over the benefit plans to allow the Court to determine whether they had fiduciary status. Similarly, even if Fruehauf and/or Terex have fiduciary status, an officer or director of a corporate fiduciary generally is not a fiduciary simply by virtue of his corporate position. *Confer v. Custom Engineering Co.*, 952 F.2d 34, 37 (3d Cir.1991). However, an officer or director may be a fiduciary if he exercises discretion over the management, assets, or administration of the plan. *See id.* The factual record is insufficient to determine whether Rosenberg exercised discretion over the benefit plans in his capacity as director and officer of Fruehauf/Terex sufficient to make him a fiduciary.

■■■ As to the third set of allegations, professionals, such as attorneys, rendering advice in their professional capacity are not ERISA fiduciaries. *Painters of Philadelphia District Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1149 (3d Cir.1989) (outside accountant not fiduciary); *Nieto v. Ecker*, 845 F.2d 868, 871 (9th Cir.1988) (attorney not fiduciary). However, a professional rendering professional advice may be a fidu-

ciary if he uses that advice to exercise control over the management, assets, or administration of the plan. *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259–60 (2d Cir.1987) (cited favorably in *Painters of Philadelphia*, 879 F.2d at 1151). In this case, there are allegations that Rosenberg, while acting as an attorney, also was sitting on the Board of the benefit plan sponsor corporations and had a financial interest in the outcome of the transaction. Accordingly, whether his legal opinion made him a fiduciary will turn on whether he had sufficient discretion over management, assets, or administration of the benefit plans. This is a fact specific inquiry for which the record is not sufficiently developed at this time. Since the factual record is incomplete, the Court will not now dismiss the ERISA claims against Rosenberg because of a lack of fiduciary status.

### 4. Loss Causation

Lenz and Rosenberg argue for dismissal of Count 7 because it fails to allege a causal connection between the breach of fiduciary duty and the loss to the plan, as required by ERISA § 409(a), 29 U.S.C. § 1109(a). Plaintiffs counter that § 1109(a) does not require a showing of loss causation and that, even if it does, they have adequately pled loss causation.

■■■ First, § 1109(a) requires a causal connection between the breach and the resultant damage:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary. . . .

29 U.S.C. § 1109(a). Under § 1109(a), the fiduciary is liable for at least two types of

damages: losses to the plan and profits made by the fiduciary. In order to recover damages for losses to the benefit plans, the Plaintiffs must show causation between the breach of fiduciary duty and the loss. *See In re Unisys Savings Plan Litigation,* 74 F.3d 420, 445 (3d Cir.1996) (interpreting similar language in 29 U.S.C. § 1104(c) to require causal connection and quoting *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982) (holding that § 1109(a) requires causal connection between breach and loss)); *Reich v. Compton,* 57 F.3d 270, 286 n. 23 (3d Cir.1995) (in dicta); *Abrams v. Dean Witter Reynolds, Inc.,* 1999 WL 130612, *4 (E.D.Pa.1999). Similarly, in order to recover profits, Plaintiffs must show a causal connection between the breach and the profits gained by the fiduciary. *See Felber v. Regan,* 117 F.3d 1084, 1087 (8th Cir.1997).[40]

▆ Second, the Amended Complaint adequately pleads a causal connection between the breach of fiduciary duty and the losses to the benefit plans and/or profits gained by Lenz and Rosenberg. For example, it alleges that Lenz breached his fiduciary duty by entering into an agreement with Adams, causing a loss of almost $750,000 to the benefit plans. AC ¶ 65. In addition, the Amended Complaint alleges gains to Lenz and Rosenberg and losses to the benefit plans caused by their self dealing transactions involving AAT, Terex SAR's, and improper loans. AC ¶¶ 59–64. The Court finds these allegations sufficient to allege causation between breaches of fiduciary duty and the losses to the benefit plans and the profits made by Lenz and Rosenberg. Accordingly, Count 7 will not be dismissed for this reason.

### 5. Rule 9(b)

▆ Lenz and Rosenberg assert that the ERISA counts related to the SAR's must be dismissed for failure to comply with Fed.R.Civ.P. 9(b) which requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Rule 9(b) generally does not apply to ERISA claims, unless the underlying allegations are grounded in fraud. *Concha v. London,* 62 F.3d 1493, 1502 (9th Cir.1995); *Thornton v. Evans,* 692 F.2d 1064, 1082–83 (7th Cir.1982); *In re Ikon Office Solutions, Inc. Securities Litigation,* 86 F.Supp.2d 481, 487–88 (E.D.Pa.2000). The Court finds that, to the extent Rule 9(b) applies to the ERISA claims related to the SAR's, the circumstances surrounding the fraud are pled with particularity.

Section V.B.6, *supra,* recites the general principles of Rule 9(b). The Amended Complaint adequately alleges fraud regarding the transaction involving the SAR's by alleging Lenz ensured the undervaluation of the SAR's by concealing inside knowledge about their value. AC ¶¶ 62–63.[41] Although the allegations do not contain all of the specific facts and circumstances surrounding the transaction,

---

**40.** Plaintiffs' citation to *Framingham Union Hosp., Inc. v. Travelers Ins. Co.,* 721 F.Supp. 1478 (D.Mass.1989), for the proposition that there need not be a causal connection between breach of fiduciary duty and profits gained by the fiduciary, is incorrect. That case holds that a Plaintiff may recover profits gained by the fiduciary, even if there is no loss to the plan. *See id.* at 1487. It does not discuss whether causation must be shown to recover profits. *See id.* The Third Circuit Court of Appeals has not addressed this issue. It would be incongruous to require a showing of causation to recover losses but not profits. Also, the Third Circuit Court of Appeals has more broadly required a showing of causation for ERISA violations. *See In re Unisys Savings Plan Litigation,* 74 F.3d at 445 (requiring

showing of causation under 29 U.S.C. § 1104(c)).

**41.** These paragraphs allege:

62. *Prohibited transaction involving Terex Stock Appreciation Rights.* In 1993, Terex contributed its own stock to the Master Trust to satisfy its minimum funding obligations required by ERISA. Lenz then *caused the Master Trust to invest in Terex* stock appreciation rights (the "SARs"). Although Lenz obtained an independent appraiser for the apparent act of valuing the SARs, Lenz ensured that the valuation would lack essential facts [sic] and result in under valuation of the SARs. Lenz failed to disclose to the independent appraiser the inside knowledge he possessed that the stock and SARs were undervalued. In

the Court is satisfied that the allegations are pled with sufficient particularity. It follows, the Court will not dismiss the ERISA claims for this reason.

## VI. CONCLUSION

Defendants' Motion to Dismiss will be DENIED as to all counts except for Count 6 (breach of contract) which will be dismissed to the extent it is premised upon breaches of the duties of due care, good faith, and loyalty.

1994, Lenz allocated Terex' stock and SARs entirely to the Terex Trust, with none allocated to the Fruehauf Trust.

63. Lenz' allocation of the SARs entirely to Terex was self-dealing and a prohibited transaction because as shown shortly after the allocation, the SARs were substantially greater in value than the value assessed in connection with the allocation. The Terex Trust, not the Fruehauf Trust, obtained all of the benefit of the true increase of value of the SARs. This increased value resulted not from improved economic or market conditions, but from the undervaluation of the Terex stock and SARs that resulted from Lenz' failure to disclose his insider knowledge. Lenz made the allocation to Terex knowing that the SARs would soon thereafter substantially increase in value. Lenz breached his fiduciary duty by failing to disclose or consider his inside information when making such an allocation. Lenz direction of a prohibited transaction was a breach of fiduciary duty.